[No. B026035. Second Dist. Div. Five. Jan. 26, 1989.]

FRED OKRAND, Plaintiff and Appellant, v.
CITY OF LOS ANGELES, Defendant and Respondent;
FRIENDS OF LUBAVITCH, INC., Intervener and Respondent.

## COUNSEL

Carol A. Sobel, Gary Williams, Mark Rosenbaum and Paul L. Hoffman for Plaintiff and Appellant.

James K. Hahn, City Attorney, Pedro B. Echeverria, Assistant City Attorney, and Marcia Haber Kamine, Deputy City Attorney, for Defendant and Respondent.

Alschuler, Grossman & Pines, Marshall B. Grossman, Burt Pines, Jeffrey G. Kichaven and Daniel B. Spitzer for Intervener and Respondent.

## OPINION

**BOREN, J.**—Does the City of Los Angeles violate the establishment of religion clause of the United States and California constitutions when it permits display of an unlit menorah located near a decorated Christmas tree in the rotunda of its city hall? We conclude that the display in this case does not offend constitutional principles and affirm the trial court's order awarding judgment to the City.

### FACTS

The facts are not disputed. On December 5, 1985, respondent "Chabad" (more formally known as Friends of Lubavitch, Inc.), an orthodox Jewish organization, obtained permission from

respondent City of Los Angeles[1] to display an unlit menorah known as the Katowitz Menorah in the Los Angeles city hall rotunda during Chanukah of that year.[2]

The following day, December 6, 1985, in the superior court, appellant[3] sued respondents for injunctive and declaratory relief, asking that respondents be restrained from displaying the menorah. That same day the superior court issued a temporary restraining order prohibiting the display of a *lighted* menorah in the rotunda. Ultimately, the court held that the display of the unlit Katowitz Menorah was constitutional, granted respondents' motion for summary judgment, and dismissed the matter. This appeal followed.

The Katowitz Menorah was crafted by an early 19th Century Italian artist named Rosso. His work was presented to the Jewish congregation of the Great Synagogue of Katowitz in Poland. At the center of the menorah stands a double eagle that was a symbol of the Hapsburg Empire. This menorah remained with the Katowitz Synagogue until World War II. It was rescued from the Nazi Holocaust and is now owned by Chabad.

For several years the City of Los Angeles has used the rotunda of its city hall, in conjunction with the adjacent corridor to the City Hall Annex Building, to house various displays and exhibits of a historical, cultural and artistic nature. These exhibitions have included such diverse subjects as the Olympics, the Space Shuttle program, housing, health care, the motion picture industry, major charities such as United Way and March of Dimes, earthquakes and consumer rights. Some of the exhibits have also portrayed the history, heritage, and art of such ethnic and minority groups as African-Americans, senior citizens, Asian-Americans, Japanese-Americans, suffragettes and Central American refugees. In June 1985, one exhibit displayed art and handicrafts from Los Angeles. That same month also saw a presentation entitled the "U.S.C. Art Show of Renaissance Art and Modern Art." This exhibition included a portrait of "Madonna and Child." Other art exhibits have been devoted to Ecuadorian, Hungarian and Jordanian

---

[1] Respondent City of Los Angeles and Greg Wilkins, a city administrator alleged to be in charge of city hall displays, were defendants below. Respondent Chabad was an intervenor.

[2] Chanukah (also spelled "Hanukkah" or "Hanukah" in its transliteration from the Hebrew) is a Jewish holiday celebrated during an eight-day period which often falls at or near the time of Christmas. Chanukah celebrates the victory of the Jewish people, led by a small group known as the Maccabees, over their Greek-Syrian oppressors in 165 B.C. The holiday, which is also known as "The Festival of Lights," is celebrated, in part, by lighting a Chanukah menorah. The Chanukah menorah is a multibranch candelabrum on which one candle is lit on the first day and an additional candle on each successive day of the eight-day holiday. A ninth candle, called the "shamesh," is used to light the other eight.

[3] Appellant filed this lawsuit in his capacity as a resident and a taxpayer of the City of Los Angeles. The record indicates that appellant is a corporate director and the former legal director of his legal counsel, the American Civil Liberties Union (ACLU).

history and culture. The Mayor's Office sponsored "The Ann (*sic*) Frank Exhibit" in summer 1986, featuring photographs and Jewish memorabilia from the Nazi Holocaust.

During each Christmas holiday season, the rotunda has traditionally displayed a Christmas tree decorated with ornaments presented by various ethnic and cultural groups. In 1983, the Christmas tree was decorated with "Kawanza" Christmas ornaments, carved wooden icons from South Africa. For Christmas of 1984, the German Consulate presented the ornaments, among which were angels, madonnas and figurines of St. Nicholas. The Christmas tree for 1985 was donated by the Canadian Consulate and decorated with ornaments furnished by various city employee associations.

During Chanukah of 1983 and 1984, which overlapped the Christmas holiday season, the Katowitz Menorah was displayed in the rotunda along with the decorated Christmas tree. In each of those two years, the display was accompanied by a Chanukah ceremony in which the candles on the menorah were lit. For 1985, the city prohibited the ceremonial lighting of candles on the menorah.[4] The menorah displayed in the rotunda was accompanied by a sign describing the history of the Katowitz Menorah.[5] December 1986 once more saw the Christmas tree and season's display along with a presentation depicting Hungarian art and history and a reception for the "Jordanian Art and Cultural Festival." Again, the Katowitz Menorah was displayed in the rotunda. It is the constitutionality of the display of the unlit Katowitz Menorah which is the subject of this appeal.

## DISCUSSION

■ Appellant contends that the trial court erred by denying injunctive and declaratory relief because the display of the menorah violates the establishment clauses of both the federal and state Constitutions. He advances two bases for his contention: (1) the city hall is not a location in which the

---

[4] Chabad was not prohibited from conducting, separate and apart from the rotunda display of the Katowitz Menorah, a Chanukah ceremony on the steps of the city hall, which is a public forum area. The propriety of the 1985 ceremony on the steps of the city hall is not an issue raised by this appeal.

[5] This sign read as follows:

"THE KATOWITZ MENORAH

"The 'FREEDOM MENORAH' was rescued from the flames of the Holocaust. Its former home was the Great Synagogue of Katowitz in Poland.

"The Menorah was commissioned in the early 1800's. The eagles on the top of the Menorah are the 'Hapsburg Eagles.' They were incorporated in the design of the Menorah in appreciation and gratitude for the protection that the Hapsburg Empire granted the Jewish populace [*sic*].

"The Menorah was crafted in Italy in the Italian Renaissance style. Each piece of the Menorah was individually hand-carved. The Menorah was designed, crafted and signed by the Artist 'Rosso.' "

city can constitutionally display a menorah; and (2) the city's display of the menorah is unconstitutional because the city does not display with the menorah other wholly secular objects to neutralize the menorah's religious character.

Appellant relies principally on three federal circuit court of appeals decisions. The first two of these decisions, *American Jewish Congress* v. *City of Chicago* (7th Cir. 1987) 827 F.2d 120, and *American Civil Liberties U.* v. *City of Birmingham* (6th Cir. 1986) 791 F.2d 1561, do not involve a menorah and are thus distinguishable. As to the third, *American Civil Liberties Union* v. *Allegheny County* (3d Cir. 1988) 842 F.2d 655, the United States Supreme Court has granted certiorari. (488 U.S. 816 [102 L.Ed.2d 32, 109 S.Ct. 53] (1988).) In *Allegheny County,* the court found that the county's display of both a creche inside the main entrance of its courthouse and a menorah on the steps of another government building violated the establishment clause.

■  While decisions of lower and intermediate federal courts are entitled to great weight, they are merely persuasive and not binding on state courts. (*Rohr Aircraft Corp.* v. *County of San Diego* (1959) 51 Cal.2d 759, 764 [336 P.2d 521]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 780, p. 751.) Thus, we are not bound by any of the three cases cited. Moreover, we find that the facts in this case demonstrate no governmental action which tends to "establish" religion as defined by either the Supreme Court of the United States or the Supreme Court of California.

"The First Amendment of the United States Constitution decrees, 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .' [¶]  ■  The Amendment is made applicable to the states through the Fourteenth Amendment (*Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203, 215 [10 L.Ed.2d 844, 854, 83 S.Ct. 1560]). [¶] California's Constitution, however, in provisions not dependent upon the federal Constitution (Cal. Const., art. I, §§ 4, 24) expresses the same sentiments: 'Free exercise and enjoyment of religion without discrimination or preference are guaranteed. . . . The Legislature shall make no law respecting an establishment of religion.' (Cal. Const., art. I, § 4.) [¶] But California's constitutional provisions are more comprehensive than those of the federal Constitution (*Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792, 796 [150 Cal.Rptr. 867, 587 P.2d 663]). . . ." (*Bennett* v. *Livermore Unified School Dist.* (1987) 193 Cal.App.3d 1012, 1016 [238 Cal.Rptr. 819].)

California cases addressing this subject matter are few. And frequently an analysis under either the state or the federal Constitution produces no different results. (See *Perumal* v. *Saddleback Valley Unified School Dist.*

(1988) 198 Cal.App.3d 64, 71-75 [243 Cal.Rptr. 545].) ▮ Thus, when California courts examine the constitutionality of an action based on independent state grounds, they may "also consult principles of federal cases as they seem compelling guides to uncharted state grounds." (*Feminist Women's Health Center, Inc.* v. *Philibosian* (1984) 157 Cal.App.3d 1076, 1086 [203 Cal.Rptr. 918].)

## I

With respect to the federal Constitution, the decision of the United States Supreme Court in *Lynch* v. *Donnelly* (1984) 465 U.S. 668 [79 L.Ed.2d 604, 104 S.Ct. 1355] is controlling and places the present controversy into perspective. In *Lynch,* the City of Pawtucket, Rhode Island, erected a Christmas display "as part of its observance of the Christmas holiday season." (*Lynch* v. *Donnelly, supra,* at p. 671 [79 L.Ed.2d at p. 608].) This display included traditional decorations and figures associated with Christmas including a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cut-out figures such as a clown, an elephant and a teddy bear, hundreds of colored lights, a large banner which read "Seasons Greetings," and the creche which was at the heart of the controversy in *Lynch*. All components of the display were owned by the city although it was placed in a park owned by a nonprofit organization and located in the heart of the Pawtucket shopping district. The creche was a traditional nativity scene which included figures of the Infant Jesus, Mary and Joseph, angels, shepherds, kings and animals. (*Ibid*. [79 L.Ed.2d at pp. 608-609].)

In holding that the City of Pawtucket had not violated the establishment clause of the First Amendment by including a creche in its annual Christmas display, the court observed: "No significant segment of our society and no institution within it can exist in a vacuum or in total or absolute isolation from all other parts, much less from government. 'It has never been thought either possible or desirable to enforce a regime of total separation . . . .' *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U.S. 756, 760 (1973). Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions and forbids hostility toward any. See, *e.g., Zorach* v. *Clauson,* 343 U.S. 306, 314, 315 (1952); *Illinois* ex rel. *McCollum* v. *Board of Education,* 333 U.S. 203, 211 (1948). Anything less would require the 'callous indifference' we have said was never intended by the Establishment Clause. *Zorach, supra,* at 314. Indeed, we have observed, such hostility would bring us into 'war with our national tradition as embodied in the First Amendment's guaranty of the free exercise of religion.' *McCollum, supra,* at 211-212." (*Lynch* v. *Donnelly, supra,* 465 U.S. at p. 673 [79 L.Ed.2d at p. 610].)

In *Lynch,* the Supreme Court emphasized its "unwillingness to be confined" in its "line-drawing process" to "any single test or criterion" and observed that it had on occasion not found it useful to employ the so-called tripartite test of *Lemon* v. *Kurtzman* (1971) 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105].[6] Nonetheless, the court's analysis touched upon each of the three prongs of the test set forth in *Lemon*: (1) whether the challenged law or conduct has a secular purpose; (2) whether its principal or primary effect is to advance or inhibit religion; and (3) whether it creates an excessive entanglement of government with religion. (*Lynch* v. *Donnelly, supra,* 465 U.S. at p. 679 [79 L.Ed.2d at p. 613]; *Lemon* v. *Kurtzman, supra,* 403 U.S. at pp. 612-613 [29 L.Ed.2d at pp. 755-756].) However, the principal emphasis in *Lynch* was on the first prong, the court stating that the "narrow question is whether there is a secular purpose for Pawtucket's display of the creche." (*Lynch* v. *Donnelly, supra,* 465 U.S. at p. 681 [79 L.Ed.2d at p. 615].)

In analyzing that "narrow" issue, the Supreme Court focused not simply on the creche alone but "on the creche in the context of the Christmas season." (465 U.S. at p. 679 [79 L.Ed.2d at p. 614].) The court found that a governmental activity may be invalidated "on the ground that a secular purpose was lacking, but only when [the court] has concluded there [is] no question that the statute or activity was motivated wholly by religious considerations." (*Id.* at p. 680 [79 L.Ed.2d at p. 614].) The Supreme Court rejected the lower court's inference, derived from the undisputed religious nature of the creche, that Pawtucket had no secular purpose for the display. The lower court had rejected Pawtucket's claim that its reasons for including the creche were essentially the same as its reasons for sponsoring the display as a whole. The Supreme Court disapproved of the lower court's finding and held that it had "plainly erred by focusing almost exclusively on the creche." (*Ibid.*)

No similar error was made by the trial court in the instant matter. It recognized the religious significance of the menorah but found that in the context of its display at city hall it served the "valid public purpose" of educating and enlightening the public about historical events pertaining to a large segment of the Los Angeles populace. Certainly the Katowitz Menorah is historically significant because it was saved from the destruction of the Nazi Holocaust and represents the many European Jews who survived Nazi horrors and who, with their cultural heritage, immigrated to Los

---

[6] As to California, it has been held that its courts should not view the *Lemon* tripartite test as absolute, "but as a touchstone with which to identify instances where the objectives of the establishment clause have been compromised. [Citation.]" (*Johnson* v. *Huntington Beach Union High Sch. Dist.* (1977) 68 Cal.App.3d 1, 11 [137 Cal.Rptr. 43].) The purpose of the establishment clause is "to protect against . . . 'sponsorship, financial support, and active involvement of the sovereign in religious activity.' [Citations.]" (*Ibid.*)

Angeles. This menorah constitutes a cultural artifact of particular interest to these survivors, their descendents, the Jewish community as a whole and the general population, as well. As the trial judge observed, "The fact [the menorah] also has high religious significance to Jews does not mean its display does not also provide cultural and educational development to the citizenry at large."

Viewing the display of the creche in the context of the Christmas holiday season, the Supreme Court held that it had not been established that Pawtucket's "inclusion of the creche is a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message." (*Lynch* v. *Donnelly, supra,* 465 U.S. at p. 680 [79 L.Ed.2d at p. 614].) Our view of the City of Los Angeles' display of the menorah is similar. In the context of the rotunda's continual exhibition of artistic, cultural and historical displays, the exhibition of an unlit menorah along with the Christmas tree decorated with ornaments of varied religious significance evinces no "effort to express some kind of subtle governmental advocacy of a particular religious message." (*Ibid.*)

What clearly *is* suggested is that the city has illustrated its diversity, as well as its international and cultural eminence, by the variety of rotunda displays it permits. The United States Constitution requires no discouragement of that effort. Indeed, it appears to us that the inclusion of the Katowitz Menorah during the winter holiday period promotes an image of a local government that is impartial toward religions. No one suggests, for example, that the inclusion of the African icons as ornaments during a prior holiday season constituted an endorsement of African religious faiths. The winter holiday season is important not only to the Christian citizens of Los Angeles who celebrate Christmas but to the Jewish citizens who coincidentally celebrate Chanukah.

We recognize that permitting several displays from different religious groups, rather than from only one, does not necessarily legitimize what may otherwise constitute an establishment clause violation. ■ Nonetheless, to respect and depict the origins and trappings of the holiday season constitutes a legitimate secular purpose. (*Lynch* v. *Donnelly, supra,* 465 U.S. at p. 681 [79 L.Ed.2d at p. 615].) It is not rendered any less constitutional merely because items from more than one religious group are displayed.

■ As to the second prong of the *Lemon* test, we likewise do not discern that the primary effect of the display of the Katowitz Menorah is "to confer a substantial and impermissible benefit" on either the Jewish faith or religion in general. (*Lynch* v. *Donnelly, supra,* 465 U.S. at p. 681 [79 L.Ed.2d at p. 615].) The inclusion of the menorah provides no greater aid to religion than any "benefits and endorsements previously held not violative

of the Establishment Clause" (*id.* at p. 682 [79 L.Ed.2d at p. 616]) and certainly no greater than the Pawtucket creche provided.

When compared to a creche, an unlit menorah, standing alone, presents no vivid images relating to a central tenet of faith as does a creche. However, a "nativity scene, with its figures of Mary, Joseph, the infant Jesus, the Magi, shepherds, angels, and animals, is an unequivocal Christian symbol, unlike the Christmas tree and the reindeer and the tinsel and Santa Claus." (*American Civil Lib. Union* v. *City of St. Charles* (7th Cir. 1986) 794 F.2d 265, 271.) A creche very vividly portrays a religious event which lies at the core of Christianity and depicts "Christ's birth as a unique act of divine intervention . . . . [¶] . . . . The creche has no other significance or message—it is a purely religious symbol." (*American Civil Liberties U.* v. *City of Birmingham, supra,* 791 F.2d 1561, 1566.) Nonetheless, the Supreme Court upheld its display in *Lynch* v. *Donnelly, supra.*

On the other hand, even the majority in *Allegheny County* did not dispute that, aside from its association with the holiday of Chanukah, a menorah has " 'no inherent religious significance,' unlike certain other objects such as a Torah scroll . . . ." (*American Civil Liberties Union* v. *Allegheny County, supra,* 842 F.2d 655, 662.) We fail to see how a menorah of conceded historical value standing in the rotunda and in the shadow of a large decorated Christmas tree sends any greater religious message than does the tree.

In *City of Chicago, supra,* 827 F.2d 120, the court, in an analysis under the second prong of the *Lemon* test, held unconstitutional a creche displayed in the city hall lobby even though it was numbered among other holiday displays placed throughout the hall and its neighboring plaza. These included a decorated Christmas tree, a mechanical Santa Claus with sleigh and two reindeer, and carolers and recorded holiday music. The majority in that case avoided any "debate" over whether a creche's religious significance was "neutralized' by [these] secular symbols of holiday cheer" by focusing on the creche's "placement in City Hall." (*Id.* at p. 126.) Based on that factor, the majority found that *Lynch* was distinguishable and that "the Supreme Court's decision in *Lynch* does not control this case." (*Ibid.*) We find that conclusion difficult to fathom. The Supreme Court did utilize the tripartite *Lemon* test in *Lynch,* and yet the high court took pains to emphasize that its analyses in religion cases need not be confined to the *Lemon* test. (*Lynch* v. *Donnelly, supra,* 465 U.S. 668, 679 [79 L.Ed.2d 604, 613-614].) The court found that its central focus must be on the "context" of the display (*ibid.*) and on the question of whether it had a secular purpose. (*Id.* at p. 681 [79 L.Ed.2d at p. 615].)

In the context of exhibits in the rotunda of the Los Angeles city hall, the display of the menorah certainly had the secular purpose of education

which we have previously mentioned. It also was presented in the context of celebrating the winter holiday season so as to include non-Christians.

As Judge Weis noted in his dissenting opinion in *Allegheny County*, "in displaying both Jewish and Christian holiday symbols, the local governments allowed those faiths to call attention to the miracles enriching their histories, thereby demonstrating the harmony of their ideals of 'bringing light to the world.' [¶] . . . . [A] reference to Chanukah did no more than broaden the commemoration of the holiday season and stress the notion of sharing its joy. By marking the Judeo-Christian aspects of the holiday season, the local governments appropriately called attention to the great pluralism that is the hallmark of religious tolerance in this country." (*American Civil Liberties U.* v. *Allegheny County, supra,* 842 F.2d 655, 670-671.)

In *City of Birmingham,* the majority found that the city's "unadorned" display of a nativity scene on the front lawn of city hall violated the establishment clause because the display was not accompanied by secular holiday decorations and had no nonreligious trappings to temper its religious impact. (*American Civil Liberties U.* v. *City of Birmingham, supra,* 791 F.2d 1561.) The court held that when a creche "stands alone as the only clearly identifiable symbol chosen by the city to mark its contribution to the [holiday] celebration[,] [t]he direct and immediate effect . . . is endorsement of a particular religion." (*Id.* at p. 1567.)[7]

Both *City of Chicago* and *City of Birmingham* drift far from the essence of the *Lynch* decision. As Judge Weis stated in his dissenting opinion in *Allegheny County,* "The *City of Chicago*'s governmental location distinction ignores the Supreme Court's observation in *Lynch* that the Pawtucket creche was essentially similar to those displays found nationwide—'often on public grounds.' *Lynch,* 465 U.S. at 671, 104 S.Ct. at 1358. Municipal participation was no secret, and the Supreme Court treated the display as governmental action. [¶] Moreover, the court of appeals' preoccupation with the Christmas display location in City Hall is especially perplexing in light of the Supreme Court's decision in *Marsh v. Chambers.* In that case, the challenged prayer service was conducted in the legislative chamber itself—not a public area of the capitol building. If the Supreme Court did not consider that practice a prohibited endorsement of sectarian beliefs espoused by the legislatively-paid chaplain, it is difficult to understand why a creche displayed in a government building during the Christmas season

---

[7] Since the Supreme Court granted certiorari in *Allegheny County, supra,* 842 F.2d 655, the Court of Appeals for the Seventh Circuit (the same circuit which authored *City of Chicago, supra,* 827 F.2d 120), in a majority per curiam opinion, upheld as constitutional a nativity scene on a village hall lawn. This creche was part of a display which included lights on evergreen trees, a wreath, a decorated Christmas tree, a Santa Claus and sleigh, carolers, snowmen and two soldier-nutcrackers. (*Mather* v. *Village of Mundelein* (7th Cir. 1989) 864 F.2d 1291.)

cannot pass constitutional muster. Indeed, the fact that Christmas has been declared a national holiday by the state (and that action is not considered a forbidden endorsement) weighs heavily against the *City of Chicago* rationale." (*Allegheny County, supra,* 842 F.2d 655, 668.)

We also agree with Judge Weis that the "adorned/unadorned distinction" is neither an effective nor persuasive one. Judge Weis wrote: "As Justice O'Connor noted, the secular decorations surrounding the Pawtucket creche did not nullify its sectarian religious significance. Rather, the December holiday setting was the element that altered 'what viewers may fairly understand to be the purpose of the display—as a typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content.' *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring)." (*Allegheny County, supra,* 842 F.2d at p. 669.)[8]

In the rotunda of the Los Angeles city hall, a museum-like setting in view of its repeated use for display of education and artistic exhibits, the Katowitz Menorah carried with it no message endorsing the Jewish religion, any more than did the previous display of the Anne Frank exhibit.

As to the third prong of the *Lemon* test, the Supreme Court has stated that "[e]ntanglement is a [matter] of kind and degree." (*Lynch* v. *Donnelly, supra,* 465 U.S. at p. 684 [79 L.Ed.2d at p. 617].) In *Lynch,* the creche, as well as the other components of the display, was owned and maintained by the city, and, although the prominent display was located in a park owned by a nonprofit organization, the entire display was clearly a project sponsored by the city. Here, the menorah is displayed on government property, the city hall itself. In a vacuum, that fact might have overriding significance. However, in the context of the rotunda's regular use for historical, cultural and artistic displays it does not. The City of Los Angeles does not own the menorah nor does it have the year-to-year upkeep responsibility that the City of Pawtucket had for its creche. The only interaction between the city and Chabad is the city's act of granting permission for the menorah to be displayed. There is no day-to-day coordination between religion and government required, and no city funds are expended. The only political divisiveness we can perceive is that represented by this lawsuit

---

[8] In rejecting the *City of Birmingham*'s adorned/unadorned distinction, Judge Weis stated that "*Lynch* simply does not not support applying such a 'Two Plastic Reindeer' rule." (*Allegheny County, supra,* 842 F.2d at p. 668; see Note, *Of Crosses and Creches: The Establishment Clause and Publicly Sponsored Displays of Religious Symbols* (1986) 35 Am.U.L.Rev. 477, 495.) In a footnote, Judge Weis also refers to the dissenting opinion in *City of Birmingham* wherein Judge Nelson "described this [same] distinction with the similarly fitting label, the 'St. Nicholas, too' test. *City of Birmingham,* 791 F.2d at 1569 (Nelson, J., dissenting) ('a city can get by with displaying a creche if it throws in a sleigh full of toys and a Santa Claus, too')." (*Allegheny County, supra,* at p. 669, fn. 5.)

alone. Hence, the record does not show any excessive entanglement between religion and government.

The display of this menorah in conjunction with the Christmas tree in no way embraces religion or to any extent establishes it. The city hall's rotunda is obviously used to highlight the cosmopolitan makeup of one of the world's more significant cities. The annual Christmas tree has displayed art objects from various nations including icons from South Africa, as well as angels and madonnas from Germany. To exclude the Jewish relic merely because Chanukah occurs during the same winter season in which Christmas is celebrated is to reward intolerance at the expense of accommodation.

Quoting from *Zorach* v. *Clauson, supra,* 343 U.S. 306, 313 [96 L.Ed. 954, 962, 2 S.Ct. 679], this nation's Supreme Court reiterated that: " 'We are a religious people whose institutions presuppose a Supreme Being.' " (*Lynch* v. *Donnelly, supra,* 465 U.S. at p. 675 [79 L.Ed.2d at p. 611].) The Court made sundry references to the nation's religious heritage, which is embodied in this country's institutions including its holidays. We note particularly the Court's observation that the "National Gallery in Washington, maintained with Government support, for example, has long exhibited masterpieces with religious messages, notably the Last Supper, and paintings depicting the Birth of Christ, the Crucifixion, and the Resurrection, among others with explicit Christian themes and messages. The very chamber in which oral arguments on this case [i.e., *Lynch* v. *Donnelly*] were heard is decorated with a notable and permanent—not seasonal—symbol of religion: Moses with the Ten Commandments. Congress has long provided chapels in the Capitol for religious worship and meditation." (*Id.* at pp. 676-677 [79 L.Ed.2d at p. 612], fn. omitted.)

In addition to such examples of religious expression, the Court stated that "[e]qually pervasive is the evidence of accommodation of all faiths and all forms of religious expression, and hostility to none. Through this accommodation, as Justice Douglas observed, governmental action has 'follow[ed] the best of our traditions' and 'respect[ed] the religious nature of our people.' [*Zorach* v. *Clauson, supra,* ] 343 U.S. at 314." (*Lynch* v. *Donnelly, supra,* 465 U.S. at pp. 677-678 [79 L.Ed.2d at p. 613].)

We therefore hold that, notwithstanding the religious significance of the Katowitz Menorah, respondents have not violated the establishment clause of the First Amendment of our federal Constitution.

## II

We also find that the display of the Katowitz Menorah does not violate the Constitution of the State of California. The most applicable California authority is the Supreme Court's decision in *Fox* v. *City of Los Angeles*

(1978) 22 Cal.3d 792 [150 Cal.Rptr. 867, 587 P.2d 663]. In *Fox,* the Supreme Court refused to allow the City of Los Angeles to illuminate the windows of its city hall in the configuration of a huge Latin cross at Christmastime.[9]

In *Fox,* the Supreme Court set forth what may be referred to as a "preference" test. That is, we are to inquire whether the governmental action exhibits a preference for a religion or a religious belief. (*Fox, supra,* 22 Cal.3d at p. 796.) The court observed that "[t]he city hall is not an immense bulletin board whereon the symbols of all faiths could be thumbtacked or otherwise displayed." (*Id.* at p. 797.) The court stated that the California Constitution did not require "that each religion always be represented. To illuminate only the Latin cross, however, does seem preferential when comparable recognition of other religious symbols is impracticable." (*Ibid.*)

The majority in *Fox* noted that the city's failure or inability to recognize the symbols or holidays of other religions showed a clear act of preference. (*Fox, supra,* 22 Cal.3d at p. 797; see also conc. opn. of Chief Justice Bird at pp. 805 and 811.) The Supreme Court cited the federal case of *Allen* v. *Hickel* (D.C.Cir. 1970) 424 F.2d 944 for the rule that " 'The Government may depict objects with spiritual content, but it may not promote or give its stamp of approval to such spiritual content.' (*Id.* at p. 948.)" (*Fox, supra,* 22 Cal.3d at p. 798.) We believe that in the context in which it allowed the Katowitz Menorah to be displayed, the city exhibited no preference for the Jewish religion nor promoted it.

First of all, there was no lack of "comparable recognition of other religious symbols." (*Fox, supra,* 22 Cal.3d at p. 797.) And, in our view, display of the menorah showed no more preference for Judaism than display of the Christmas tree showed for Christianity. Second, display of the menorah at city hall may be distinguished from the lighted cross displayed in *Fox* by size and visibleness. The lighted cross in *Fox* was " 'visible for many miles in many directions, and can be and is viewed by persons driving the freeways who do not see it in the context of other Christmas decorations and who may not participate in such celebrations at all. . . .' " (*Id.* at p. 794.) The Katowitz Menorah, on the other hand, stood unlit in a corner of the rotunda that was also occupied by a decorated Christmas tree.

The menorah also differs in degree from the Latin cross in terms of its significance as a symbol of religion. The cross is the preeminent symbol of many Christian religions and represents with relative clarity and simplicity the Christian message of the crucifixion and resurrection of Jesus Christ, a

---

[9] The trial court in *Fox,* in contrast to the procedural posture of the instant case, had prohibited the display of the lighted cross and had specifically held that "the real purpose" of the city's display was "a religious one." (*Fox, supra,* 22 Cal.3d at p. 795.)

doctrine at the heart of Christianity. The menorah's significance to Judaism, on the other hand, is much less direct. Chanukah is not perceived as the most important Jewish holiday. It does not celebrate any central Jewish religious principle but rather celebrates a historical event which has provident overtones. Certainly the menorah is a central part of the traditional celebration of the holiday, but the candelabrum itself does not readily focus attention on a religious doctrine in the manner of the cross (i.e., the salvation of mankind through the atonement and resurrection of Christ), nor does it visually portray a central tenet of religion as does a nativity scene (i.e., the divine and virgin birth of Christ in mortality).

Finally, as discussed in part I, *ante,* the unlit Katowitz Menorah, with its unique historical background, was much more a museum piece than a symbol of religious worship. Had there been a renaissance painting of "Madonna and Child" exhibited in the rotunda along with the Christmas tree, we would find difficulty finding a constitutional distinction. If anything, the mixing of holiday symbols from different religions even more strongly reflects a lack of endorsement or preference for religion than does display of emblems from a single religion. We therefore uphold the trial court's ruling.

## DISPOSITION

The judgment is affirmed.

Lucas, P. J., concurred.

Kennard, J., concurred in the result.

Appellant's petition for review by the Supreme Court was denied May 18, 1989. Kennard, J., did not participate therein.