Howard T. KREISNER and the Society of Separationists, Inc. Plaintiffs,

v.

CITY OF SAN DIEGO, CALIFORNIA, Defendant.

No. 90–55354.

United States District Court, S.D. California.

Dec. 13, 1991.

Michael A. Jacobs, San Francisco, Cal., for plaintiffs.

Mary Kay Jackson, Deputy City Atty., San Diego, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HUFF, District Judge.

Plaintiff Howard Kreisner [1] brought this suit against the City of San Diego, alleging the City is violating the establishment clauses of the federal and state constitutions. The action involves the constitution-ality of a display shown in the Organ Pavilion of Balboa Park during the month of December by a private organization, the Christmas Committee.

## I

## STATEMENT OF PROCEEDINGS

Judge William B. Enright originally heard the case and granted the City's cross-motion for summary judgment in 1989. Judge Enright found the Park facilities are a "public forum," available to both religious and nonreligious groups. Judge Enright concluded the City's open access policy accommodates "both the free speech and the establishment of religion issues of the First Amendment." The plaintiff then appealed the case to the United States Court of Appeals for the Ninth Circuit. The Ninth Circuit heard oral argument on April 3, 1991, and subsequently remanded the case to the district court for further factual findings. Specifically, the Ninth Circuit instructed the district court to determine:

[W]hat are the policies of the City of San Diego with respect to granting permits for the use of Balboa Park.... If it is contended that there are oral or partially oral policies, the court shall specify any evidence indicating the establishment of such policies and any evidence indicating that the public has been made aware of such policies. The court may make any further findings on factual developments which the parties regard as material to the issues in this appeal.

The Ninth Circuit amended the order to allow the district court to "amend its conclusions of law in light of any new factual findings."

■ Upon remand, Judge Enright recused himself, and the case was transferred to this court. This court held hearings in which oral and written testimony was received on November 1, 1991 and Novem-

---

1. The Society of Separationists, Inc. was named as a plaintiff in this action. The Society, however, never made an appearance or submitted any documents to the district court before the appeal. The Society did submit a two-page doc-ument to the Ninth Circuit, but this court is unaware of the contents of that document. After the Ninth Circuit remanded the case, the Society did not take timely action to participate in the case.

ber 8, 1991. Following a review of the evidence received at those hearings, the files and records of the action, and Judge Enright's Memorandum Decision and Order dated November 8, 1989, the court adopts Judge Enright's Memorandum Decision, attached as exhibit "1," as the opinion of this court as to the federal claims, and further makes the following additional findings of fact and conclusions of law. This court agrees with Judge Enright that under the circumstances of this case,

> the City's practice of allowing the Committee to display a nativity scene in Balboa Park does not violate the Establishment Clause. Given the public forum aspect of the present case, the City's open access policy accommodates both the free speech and the establishment of religion issues of the First Amendment.

II

FINDINGS OF FACT

A. CITY'S POLICY REGARDING PERMITS IN BALBOA PARK

1. In 1988, the City created a system of permits to facilitate and accommodate uses of the Park and Park facilities. Relevant to this case, the City provides five different types of permits: (1) the park use permit, which allows for a partly exclusive, short-term grant for weddings, picnics, or other fairly large gatherings of individuals; (2) the park facility use permit, which allows exclusive use of a Park facility; (3) the right-of-entry permit, which allows exclusive use within a restricted area for longer periods of time and issued primarily to businesses and organizations; (4) the non-exclusive use and occupancy permit, which allows ongoing use of a permanent facility on the condition the facility is open to the public; and (5) the special use permit, which allows exclusive use of a site for Park-endorsed activities, such as square dancing exhibitions.

2. The regulations governing the appropriate type of permit for a particular activity are set forth in the Park and Recreation Department's fees and charges schedule. Beyond these regulations, the City has not presented any evidence of a written policy regarding the issuance of permits.

3. This court finds that the City's policy regarding the issuance of permits is an oral policy. Specifically, the City's policy is one of "first come, first served," allowing access to the Park or Park facilities to any group or individual who reasonably first requests use of the area and complies with the Park and Recreation Department's permit requirements.[2]

a. Penny Scott is employed by the City's Park and Recreation Department as the District Manager responsible for the permit system at Balboa Park. Scott testified at the hearing held before this court and in her declaration before the Ninth Circuit that the City's policy is first come, first served. Scott testified the City does not grant permits to the Christmas Committee on a preferential basis. This court finds Scott to be a credible witness after listening to her testimony and observing her demeanor.

b. Jack Krasovich, the Deputy Director of the Central Division for the City of San Diego, Park and Recreation Department, is Scott's immediate supervisor. Krasovich also testified that the City's policy is to grant permits for use of the Park and its facilities on a first come, first served basis. This court also found Krasovich to be a credible witness and accepts his testimony regarding the City's policy as true.

4. To obtain a permit for use of the park or its facilities, an individual or group must contact the Park and Recreation's office in Balboa Park. The office is open on Monday through Friday from 7:30 a.m. to 5:00 p.m., and on Saturdays and Sundays from 9:00 a.m. to 3:00 p.m. After the individual or group contacts the office by calling, writing, or visiting the office, a member of Scott's staff works with the individual or group to determine what the intended display or activity involves and the appropriate permit. The general public

2. The City has discussed whether it will require an unattended display to be covered when another group renting the space so requests. This policy has not been adopted at present.

is welcome to contact the office with questions regarding the acquisition of permits. As to a request for a display, the office reasonably requires specific information regarding the display, such as size and dimension before issuing a permit. Among other reasons, this information is necessary to accommodate other uses and to assure access to the Park for the general public. The office only provides the permit itself and does not utilize a formal permit application form.

5. This procedure and the City's oral policy of first come, first served has not presented a problem in the past. Until this year, as described below, the Christmas Committee has been the only entity to request use of the colonnades at the Organ Pavilion during the month of December for a display. Regarding other areas of the Park, Scott's staff has been successful in accommodating conflicting uses.

6. The City's Park and Recreation Department at Balboa Park is open to the public seven days a week at the times noted above. Beyond the open office, there is no additional evidence that the City has publicized or otherwise taken action to inform the general public of its policy regarding the use of the Park or its facilities. This court, notes, however, that Balboa Park is frequently used by a wide variety of individuals and groups, with and without permits, for demonstrations, vigils, and many other activities. This court accepts the testimony of the City's representative that until this year, there was only one request for an unattended display at Balboa Park. This court finds it reasonable for the City to choose not to expend its resources to publicize its policies and, instead, to provide an office with access to the public to address any inquiry concerning a permit.

7. Two to three years ago, the City agreed that a park use permit would be an appropriate permit for the Christmas Committee display. Consistent with the City's policy, the Park and Recreation office granted a park use permit to the Christmas Committee to exhibit its display in the Organ Pavilion for December 1991.

### B. ACLU'S INADEQUATE ATTEMPT TO RESERVE THE ORGAN PAVILION COLONNADES ONE DAY AFTER ORAL ARGUMENT

█ 1. The ACLU has complicated the litigation by partially attempting to obtain a permit for an unattended display at the colonnades in the Organ Pavilion for the month of December 1991. The ACLU has participated in this litigation as amicus and attended the oral argument before the Ninth Circuit on April 3, 1991, at which time the parties agreed to explore a resolution of the case. One day after oral argument, the ACLU sent its employee Janet Bergo to speak with Scott, without advising counsel for the City, about the possibility of obtaining a permit for the same time and location as sought by the Christmas Committee.

2. On April 4, 1991, Bergo brought a letter signed by Betty Wheeler, the legal director of the ACLU, to Scott to discuss the possibility of obtaining a permit. The letter requested a permit to exhibit a display celebrating the Bill of Rights in honor of the Bicentennial of the Bill of Rights. Bergo also provided a poster, but indicated the display was not intended to duplicate the poster. Bergo did not provide, nor did the April 4th letter provide, any specifics relating to size, dimension, or other mechanics of the display. Scott asked Bergo questions about the specifics of the display, and Bergo responded that the technical details needed to be worked out. Scott testified she informed Bergo she could not issue a permit at that time without further information as to the specifics of the display. Bergo responded she would check with her supervisor and get back to Scott. Bergo testified that Scott seemed excited and enthusiastic about the idea.

3. Later that afternoon, Bergo called Scott to inform her that the display would not be poster size, but would be quite large, similar to the Christmas Committee's display. Bergo still did not know the intended size or dimension of the display or the materials that would constitute the display. Scott credibly testified she needed

further information before issuing a permit and waited for Bergo to contact her again with the necessary information. After the City's legitimate request for more specifics, the ACLU took no action to construct any display, to obtain money for the display, to obtain volunteers to design the display, or to provide further specifics for the display to the City.

4. At the direction of Wheeler, Bergo next called Scott in July 1991 to inquire about the status of the ACLU's request. Scott responded that she was waiting for Bergo to provide her with the specifics of the display. After this conversation, Bergo testified that she was aware of the need for more specifics in order for the ACLU to obtain a permit.

5. The ACLU, however, did not contact Scott or anyone else in the Park and Recreation office again until October 2, 1991. On this date, Wheeler sent a belated letter to Scott to "follow up" on Bergo's inquiries. This was the first letter providing some specifics as to the intended display. However, even as of October 2, 1991, the ACLU had no plans, budget, staff or materials for the display. Regrettably, the ACLU committee in charge of celebrating the Bicentennial of the Bill of Rights did not have any plans for a display at Balboa Park. By this time, the City had issued a permit to the Christmas Committee to exhibit its display during the month of December 1991.

6. In response to Wheeler's October letter, Scott wrote to Wheeler informing her that a permit had been issued to the Christmas Committee for the Organ Pavilion colonnades for the month of December 1991. She explained the ACLU was not issued a permit because Scott was waiting for more specifics as to the ACLU's intended display. Scott had conveyed to Bergo the need for more specific information before issuing a permit. She concluded by offering to work with the ACLU to provide a suitable, alternative location. Wheeler testified an alternative location was unacceptable.

7. This court finds the City issued a permit to the Christmas Committee for December 1991 consistent with its policy of granting permits on a nonpreferential basis. Prior to October 1991, the ACLU had failed to provide Scott with the specifics legitimately requested by Scott or to follow up on Bergo's inquiries. Bergo testified she was not aware of any plans to determine the specifics of the display or to prepare for the display, such as contacting artists or volunteers. After considering all of the evidence and observing the demeanor of the witnesses, the court concludes that the ACLU simply desired to test the City's policy without taking adequate steps to arrange for the construction of a major display or to follow up on its inadequate request for a permit.

8. This court accepts as credible Scott's testimony that she was waiting for Bergo to provide her with more specific information and finds the City would have issued a permit to the ACLU for the colonnades of the Organ Pavilion for December 1991 had the ACLU complied with Scott's requests. In Scott's declaration to the Ninth Circuit, she also testified that she informed Bergo the Christmas Committee's display had been in the Organ Pavilion in the past, but she was unsure as to future displays because of the pending litigation. The court also finds it is reasonable, in light of the City resources potentially required, for the City to rely on individuals or groups to pursue any request for a permit and to refuse to follow up on each inadequate request.

## III

## CONCLUSIONS OF LAW

 The court adopts Judge Enright's well-reasoned discussion of the law governing Establishment Clause claims and the application of that law to this case. The Supreme Court recently summarized the law relating to the Establishment Clause:

> [The] government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a reli-

gious institution, and may not involve itself too deeply in such an institution's affairs.

*County of Allegheny v. ACLU*, 492 U.S. 573, 590–91, 109 S.Ct. 3086, 3099, 106 L.Ed.2d 472 (1989).[3] A government's actions will violate the Establishment Clause if the action (1) does not have a secular purpose, (2) either advances or inhibits religion in its principal or primary effect, or (3) fosters an excessive entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). The Supreme Court also has scrutinized whether the practice has the purpose or effect of "endorsing" a religion by conveying a preference for a particular religion or religious belief. *Allegheny*, 492 U.S. at 592, 109 S.Ct. at 3100. Furthermore, "It is well-settled that whether a government display violates the first amendment is indeed a question of law." *Harris v. City of Zion*, 927 F.2d 1401, 1402 n. 1 (7th Cir.1991).

The City has not violated the Establishment Clause by providing equal access to an open forum for a variety of groups, including religious organizations. The secular purpose behind the City's policy is to promote a diversity of ideas and cultures in an area easily accessible to the public. The primary effect of the City's policy neither advances nor endorses a particular religion. By allowing access to the forum on a first come, first served basis, the City merely provides an opportunity for individuals or organizations to engage in activities protected by the first amendment. The City also is not excessively entangled with the Christmas Committee. Other than promulgating a neutral and simplistic policy to allow for wide and easy access to the forum, the City's involvement with the Christmas Committee's display is nonexistent. Therefore, the City has not violated the establishment clause by allowing religious groups equal access to the Park. See *Widmar v. Vincent*, 454 U.S. 263, 271–

72, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981).

This court also concludes the City's actions do not violate California's constitutional provisions. The court is aware of the recent decision of *Hewitt v. Joyner*, 940 F.2d 1561, 1565 (9th Cir.1991), in which the Ninth Circuit held that, if possible, courts should decide cases on state constitutional grounds and avoid resolving constitutional issues. California's constitution prohibits the establishment of religion and "any appearance the government has allied itself with one specific religion." *Id.* (citing *Fox v. City of Los Angeles*, 22 Cal.3d 792, 587 P.2d 663, 150 Cal.Rptr. 867 (1978)). In *Fox*, the California Supreme Court held the lighting of a cross on the grounds of city hall exhibited a preference for a particular religion and, thus, was unconstitutional. In *Okrand v. City of Los Angeles*, 207 Cal.App.3d 566, 254 Cal.Rptr. 913 (1989), a California appellate court addressed the constitutionality of an unlit menorah on the grounds of city hall. The menorah was part of an exhibit which included a Christmas tree. The court concluded the display of the menorah did not exhibit a preference for a particular religious belief because the city made no " 'effort to express some kind of subtle governmental advocacy of a particular religious message.' " *Id.* at 574, 254 Cal.Rptr. at 918 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 680, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984)).

This case is clearly distinguishable from *Fox* and is more akin to *Okrand*. The City has not expressed a preference, nor does it appear the City has expressed a preference, for a particular religion or religious belief. The City simply provides an open forum for all groups, religious and nonreligious, to exhibit displays or conduct other activities in the park. The forum is made available to the first individual or organization that reasonably requests access and obtains a permit. Other than prohibiting obscenity and imposing reasonable time, place, and manner restrictions, the content

---

**3.** The United States Supreme Court has heard oral argument concerning the Establishment Clause in the case of *Weisman v. Lee*, 908 F.2d 1090 (1st Cir.1990), *cert. granted,* —— U.S. ——,

111 S.Ct. 1305, 113 L.Ed.2d 240 (1991), on November 6, 1991, but has not issued its opinion in that case.

of the message is irrelevant. The City's policy, therefore, also does not violate state constitutional provisions.

This case also is distinguishable from the recent decision of *Murphy v. Bilbray*, 782 F.Supp. 1420 (S.D.Cal.1991), involving the Mount Helix and Mount Soledad crosses. The *Murphy* case involved permanent religious symbols located on city and county property. This case, however, involves a public forum open to both religious and nonreligious groups to exhibit displays.

## IV

## CONCLUSION

For the reasons set forth above, the court makes the factual findings as requested by the Ninth Circuit, reaffirms the court's conclusions of law on the federal claims, and makes conclusions of law on the state constitutional claims. This court concludes that the City's practice of allowing a private committee to display a nativity scene during December does not violate the federal or state constitution.

## EXHIBIT 1

## MEMORANDUM DECISION AND ORDER

Plaintiffs Howard Kreisner and the Society of Separationists, Inc. brought this suit alleging that the City of San Diego is violating the Establishment Clause of the U.S. and California Constitutions. They seek declaratory and injunctive relief, compensatory and punitive damages, and attorney fees.

Balboa Park is a 1,200 acre public park owned and operated by the City. The park includes an Organ Pavilion, an open air theater with a stage and benches. Other sections of the park house the zoo, museums, theaters, and picnic areas.

Every year, the City sponsors Christmas holiday displays in the park, consisting of a Santa Claus and reindeer, a decorated live Christmas tree, and Christmas lights on the Prado and Laurel Street Bridge. These displays are sponsored in conjunction with the Community Christmas Center Committee.

The City also allows the Committee, a private non-profit corporation, to erect its own Christmas display by the Organ Pavilion. The Committee's display consists of eight sets of life size figures depicting the birth and life of Christ. Four scenes are placed on either side of the Pavilion.

The nativity display is directly adjacent to and approximately 240 feet from the area where the City's secular holiday displays are located. There is a natural foot progression for foot traffic to flow directly from Santa Claus and the Christmas tree to the nativity scene in the Organ Pavilion.

In past years, the nativity display was erected and stored by the City. This year, the display will be erected and removed by the Committee. It is now stored on private property. The Committee reimburses the City $150.00 for the estimated cost of the electricity used. The City does not provide any other services. The Committee must obtain a permit from the City to use the Pavilion. The City plans to issue the Committee a non-exclusive permit for the six week period beginning the last week of November.

The Committee has donation bins and information pamphlets on the site, which ask visitors to make donations to the Committee to support the display. A disclaimer sign explains that the nativity scene is privately sponsored and is not allied with the City.

The parties do not dispute the essential facts, rather they dispute how the law, particularly the recent Supreme Court holding in *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), applies to the facts. Both parties move for summary judgment.

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the burden of proving that there is no genuine issue of material fact and that judgment may be entered as a matter of law. *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987). "[A] party opposing a properly supported motion for summary judgment ... 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(e)).

The First Amendment of the U.S. Constitution provides that "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend I. The amendment applies to the states through the Fourteenth Amendment. *Everson v. Board of Education*, 330 U.S. 1, 8, 67 S.Ct. 504, 507, 91 L.Ed. 711 (1947).

Under the *Lemon* analysis, a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). The Court recently reaffirmed the three prong *Lemon* test in *Allegheny*, 492 U.S. at 590, 109 S.Ct. at 3099.

The *Allegheny* decision dealt with the effect prong of the *Lemon* test. This prong determines whether the challenged governmental practice has the effect of "endorsing" religion. *Id.* The key concern is to prohibit "government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Id.* (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687, 104 S.Ct. 1355, 1366, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring)).

The line of separation between government and religious organizations is a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Lemon*, 403 U.S. at 614, 91 S.Ct. at 2112. In attempting to draw the line in Christmas display cases, the Court emphasizes the specific facts of a particular case, focusing on the physical setting and context of the challenged display. *Allegheny*, 492 U.S. at 594, 109 S.Ct. at 3101 (Blackmun, J.); *id.* at 624–25, 109 S.Ct. at 3118 (O'Connor, Jr., concurring) ("every government practice must be judged in its *unique circumstances* to determine whether it constitutes an endorsement or disapproval of religion; *id.* at 639, 109 S.Ct. at 3125 (Brennan, J., concurring in part and dissenting in part)) ("context is all important in determining the message conveyed by particular objects."). Thus, the Court found that a creche with a "Glory to God in the Highest" banner located in the main staircase of the courthouse without other secular symbols violated the Establishment Clause because its primary effect, given the setting, was to advance religion. *Id.* at 598, 109 S.Ct. at 3103. But a menorah next to a lighted Christmas tree with a banner saluting liberty outside the city-county building did not violate the Clause. *Id.* at 612–24, 109 S.Ct. at 3111–17. In *Lynch*, 465 U.S. at 688, 104 S.Ct. at 1367, the Court upheld the display of a city-owned and erected creche in a private park in the commercial district when accompanied by other secular symbols, including Santa, reindeer, candy cane poles, carolers, circus animals, a wishing well, and a decorated tree.

In examining the physical setting, the location of the display is an important factor. For instance, displays at public schools raise serious questions, *Allegheny*, 492 U.S. at 620 n. 69, 109 S.Ct. at 3115 n. 69, as do displays located at the seat of government. *Id.* at 598, 109 S.Ct. at 3103. When located in a public forum, however, the display raises First Amendment free speech issues. *Id.* at 600 n. 50, 109 S.Ct. at 3104 n. 50. Streets and parks, the "quintessential public forums," "have immemorially been held in trust for the use of

the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). In these traditional public forums, before the government can enforce a content-based exclusion of communicative activity, it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Id.* Thus, the issue becomes whether the government can make a content-based decision to deny access to display a creche in a traditional public forum as necessary in order to serve the compelling state interest of avoiding contravention of the Establishment Clause.

The Court has had two occasions to reconcile the free speech issues in public forum law with Establishment Clause principles. In *Widmar v. Vincent,* 454 U.S. 263, 275, 102 S.Ct. 269, 277, 70 L.Ed.2d 440 (1981), the Court held that a state university, which made its facilities generally available for the student activities, could not deny access to a group desiring to use the facilities for religious worship and discussion. The university argued that the content-based exclusion was necessary to serve the compelling government interest of complying with the Establishment Clause. Applying the *Lemon* test, the Court found that an "equal access" policy was compatible with the Establishment Clause. *Id.* 454 U.S. at 271, 102 S.Ct. at 275. There was a secular purpose in allowing students a forum in which to exchange ideas, and there was no entanglement. Even though it was foreseeable that religious groups would benefit from the access to university facilities, the Court held that the benefits were incidental and did not violate the prohibition against the "primary advancement" of religion. *Id.* at 273, 102 S.Ct. at 276. The Court based this conclusion on the fact that an open forum in a public university did not confer any imprimatur of state approval on religious sects or practices, and the forum was available

to a broad class of religious and non-religious groups. *Id.* at 274, 102 S.Ct. at 276.

Three years later, the Court affirmed without an opinion, the display of a creche in a public park by a private group. *McCreary v. Stone,* 739 F.2d 716 (2d Cir. 1984), *aff'd by an equally divided Court, sub nom. Board of Trustees of Scarsdale v. McCreary,* 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985). Each year a private committee petitioned the city for permission to display a creche in a public park located in the downtown business section. The committee erected and stored the display with its own funds, though it did use city lights. In 1983, the city denied the permit for fear that the display violated the Establishment Clause. The Second Circuit relied on *Widmar* and *Lynch* to reconcile the principles of free speech in public forum and the Establishment Clause. There was a secular purpose in pursuing an open-forum policy that allowed equal access for religious and non-religious speech. *Id.* at 725. There was no entanglement problem in administering the equal access policy. Citing *Lynch,* the Second Circuit found that the city's neutral accommodation to permit the display, even if it had indirect or incidental effect, did not violate the primary effect prong of the *Lemon* test. *Id.* at 726–27.

## DISCUSSION

Plaintiffs argue that the City's practice violates the *Lemon* test and the Court's holding in *Allegheny.* They argue that the "government sponsored" display has no secular purpose, advances the interests of a particular religion, and excessively entangles the City with religion. (First Amended Complaint, p. 6, 9).

Despite the religious content of the Committee's display, there is a secular purpose in the City's practice of allowing it. The Court has long recognized that Christmas has both religious and cultural dimensions. In *Lynch,* 465 U.S. at 681, 104 S.Ct. at 1363, where the Court allowed a city owned creche in a private park, the Court found that celebrating the Christmas holiday and depicting the historical origins of the holi-

day are legitimate secular purposes. Moreover, as in *Widmar*, the City's open access policy to the park furthers the secular purpose of promoting free speech. Thus, the City's practice meets the purpose prong of the *Lemon* test.

The effect prong of *Lemon* is not violated. Plaintiffs argue that the facts of *Allegheny* and this case are the same. Actually, the facts lie between the impermissible display of *Allegheny* and the permissible display of *Lynch*. Unlike the creche in *Allegheny*, which stood alone in the main stairway of the courthouse, the display here is part of a larger display that contains secular symbols. While the Committee's display, consisting of eight life size scenes, is larger and more extensive than the display upheld in *Lynch*, there are offsetting secular elements in the park, such as the large Christmas tree and the lights along the bridge and El Prado.

"While no sign can disclaim an overwhelming message of endorsement, an 'explanatory plaque' may confirm that in particular contexts the government's association with a religious symbol does not represent the government's sponsorship of religious beliefs." *Allegheny*, 492 U.S. at 619, 109 S.Ct. at 3114–15 (citations omitted). Here, the sign explaining the private sponsorship of the exhibit reinforces that the City is not endorsing the message of the display.

Moreover, the park setting itself tempers the effect of the Committee's display. In *Allegheny*, the impermissible creche was in the courthouse, the seat of government, where "no viewer could reasonably think that it occupied this location without the support and approval of the government." *Id.* 492 U.S. at 599–600, 109 S.Ct. at 3104. The Court noted that the *Allegheny* case did not raise the kind of public forum issue of *Widmar* and *McCreary*. *Id.* 492 U.S. at 600 n. 50, 109 S.Ct. at 3104 n. 50. In contrast, here the display is located in a traditional public forum—Balboa Park.

As in *Widmar*, it is possible and foreseeable that religious groups, such as the Committee, will benefit from access to the park. But the enjoyment of merely "incidental" benefits does not violate the primary advancement of religion. Because the park, like the university facilities in *Widmar*, is open to any group, the open access "does not confer any imprimatur of state approval on religious sects or practices." *Widmar*, 454 U.S. at 274, 102 S.Ct. at 276. In addition, the park facilities are available to a broad class of religious and non-religious groups. *Id.*

Finally, the City is not excessively entangled with religion by merely allowing access to the public park to display a nativity scene. In *Lynch*, 465 U.S. at 684, 104 S.Ct. at 1364, the Court found no entanglement even though the city owned, erected, and dismantled the display. The city was not involved in the design or content of the display. Here, the City is less involved. The City does not store or erect the exhibit, it does not supervise the content of the display, nor does it spend any money maintaining the display. As in *Widmar*, 454 U.S. at 272 n. 11, 102 S.Ct. at 275 n. 11, and *McCreary*, 739 F.2d at 725, the content-neutral policy of the City avoids involvement by the City with religion, whereas enforcing an exclusion of religious groups would increase the entanglement.

In sum, the City's practice of allowing the Committee to display a nativity scene in Balboa Park does not violate the Establishment Clause. Given the public forum aspect of the present case, the City's open access policy accommodates both the free speech and the establishment of religion issues of the First Amendment as reconciled by *Widmar* and *McCreary*. Thus, summary judgment in favor of the City is granted.

On a final note, the Court dismisses the plaintiffs' pendent state law claim. The complaint raises objections to the display under the federal and state Constitutions. The parties have only briefed and argued federal law. They have not cited any California case law to interpret the relevant state constitutional provisions. Given the importance of the constitutional issue, the state claim is best heard by the state courts.

## CONCLUSION

Upon due consideration of the parties' memoranda and exhibits, the arguments advanced at hearing, and for the reasons set forth above, the court hereby denies plaintiffs' motion for summary judgment, grants defendant's motion for summary judgment on the U.S. Constitution, and dismisses the claim on the California Constitution.

DATED: November 8, 1989.

/s/William B. Enright
WILLIAM B. ENRIGHT, Judge
United States District Court