**John MURPHY, Plaintiff,**

**v.**

**Brian BILBRAY, George Bailey, Susan Golding, Leon Williams and John MacDonald, in their official capacities as members of San Diego County Board of Supervisors and the County of San Diego, Defendants.**

**Philip K. PAULSON, Howard Kreisner and the Society of Separationists, Inc., Plaintiffs,**

**v.**

**CITY OF SAN DIEGO, CALIFORNIA, Defendant.**

**James ELLIS, Plaintiff,**

**v.**

**CITY OF LA MESA, et al., Defendants.**

**Civ. Nos. 90–0134 GT, 89–0820 GT and 90–0135 GT.**

United States District Court, S.D. California.

Dec. 3, 1991.

Dan Bacal, Law Offices of Dan Bacal, El Cajon, Cal., Betty Wheeler, ACLU Foundation of San Diego and Imperial Counties, San Diego, Cal., for plaintiff John Murphy.

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, Michael B. Poynor, Deputy County Counsel, Donal M. Hill, Deputy County Counsel, County of San Diego, Cal., for defendants Brian Bilbray, et al.

A.R. Robbins, Robbins & Keehn, San Diego, Cal., amicus curiae (appearing in support of defendants).

Philip K. Paulson, pro se.

Howard T. Kreisner, San Diego, Cal., for plaintiffs Philip K. Paulson, et al.

John W. Witt, City Atty., John M. Kaheny, Asst. City Atty., Ted Bromfield, Chief Deputy City Atty., Mary Kay Jackson, Deputy City Atty., San Diego, Cal., for defendant City of San Diego, Cal.

Michael Crowley, Betty Wheeler, ACLU Foundation of San Diego and Imperial Counties, San Diego, Cal., for plaintiff James Ellis.

John S. Meyer, Knutson, Meyer & Meeker, La Mesa, Cal., for defendants City of La Mesa, et al.

## ORDER

GORDON THOMPSON, Jr., District Judge.

Before the court are 3 consolidated cases, each of which challenges the constitutionality of a local municipality's conduct with respect to the so-called "Latin cross." The Latin cross is a cross the stem of which is longer than its three other arms. One such cross, the Mt. Helix cross, is located in a municipal park in San Diego County. A second, the Mt. Soledad cross, is located in a municipal park in the City of San Diego. A third such cross is depicted on the official insignia of the City of La Mesa, which is located in San Diego County. Plaintiffs contend that the government's acquiescence in the presence and disposition of the first two Latin crosses in public parks and in the depiction of the third Latin cross on a public imprimatur violate the constitutions both of the state of California and of the United States.

This opinion addresses all three challenges. It proceeds first with an exposition of the facts relevant to each of the three challenges, then with a discussion of whether each plaintiff is entitled to sue, and finally with a discussion of the constitutional issues and how they bear on each challenge.

Because these challenges come before the court at the summary judgment stage of litigation, the court is required in its analysis of defendants' motions to interpret all evidence and justifiable inferences in the light most favorable to plaintiffs. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Conversely, the court is required in its analysis of plaintiffs' motions to consider all evidence and justifiable inferences in the light most favorable to defendants. As the material facts in all three cases appear not to be in dispute, the court shall consider them identically as to both plaintiffs and defendants and shall rule on the parties' motions as a matter of law.[1]

## I.

## FACTS

### A. *The Mt. Helix and Mt. Soledad Crosses*

The Mt. Soledad and Mt. Helix Latin crosses are substantially similar. Both stand in excess of 35 feet tall.[2] Both are illuminated nightly. Each is erected in, and is a prominent feature of, a publicly-owned park.[3] The parks in which the crosses stand are located atop two of the highest knolls in San Diego County.[4] So situated, each cross can be seen from a substantial distance.[5]

Each of the two crosses has stood for a substantial number of years where it currently stands.[6]

---

1. "It is well-settled that whether a government display violates the first amendment is indeed a question of law." *Harris v. City of Zion*, 927 F.2d 1401, 1402 n. 1 (7th Cir.1991) (citing cases). *See also id.* at 1407–1409.

2. The Mt. Helix Latin cross is 36 feet tall. It is constructed with concrete.

   The Mt. Soledad Latin cross is 43 feet tall. It is constructed with reinforced concrete and weighs approximately 24 tons.

3. The Mt. Helix Latin cross is located in the Mt. Helix Nature Theatre, a 3–4 acre park which has been owned by the defendant San Diego County since 1929, when it was deeded to the County in trust by Cyrus Carpenter Yawkey.

   The Mt. Soledad Latin cross is located in the Mt. Soledad Nature Park, a 170–acre park situated on land which has belonged to the defendant City of San Diego since the nineteenth century. The city council dedicated this property as a public park in 1916.

4. Mt. Helix is located in the La Mesa area of San Diego County. Mt. Soledad is located in the La Jolla area of the City of San Diego.

5. The Mt. Helix Latin cross is visible from the town of La Mesa and its vicinity.

   The Mt. Soledad Latin cross is visible from several miles away, including from Interstate 5, a public freeway which passes within ½ mile of Mt. Soledad Nature Park.

6. The Mt. Helix Latin cross evidently has stood where it now stands since 1925, four years before Cyrus Carpenter Yawkey deeded it, along with the rest of Mt. Helix Nature Theatre, to San Diego County.

   The Mt. Soledad Latin cross has stood where it now stands since 1954; however, it is not the first Latin cross to have been erected atop Mt. Soledad. The first known such cross was constructed of redwood and placed on Mt. Soledad by private citizens in 1913. Destroyed by van-

Neither cross was erected with public funds,[7] and each is the object of a private fund intended to provide for its maintenance.[8] Nevertheless, it appears that a small amount of public funds has also been expended for the maintenance of each.[9]

Roles both religious and secular have been ascribed to each cross. Each has on occasion been used by members of the public for Christian religious purposes.[10] Each cross also has been dedicated as a memorial to an individual or individuals who have died.[11] In addition, the cross on Mt. Helix

dalism in 1923, it was replaced with a wood and stucco cross in 1934. The 1934 cross was subsequently destroyed in 1952. The current cross replaced it.

7. Cyrus Carpenter Yawkey and Mary Yawkey White supervised and paid for the erection of the Mt. Helix Latin cross sometime before 1929, when Mr. Yawkey deeded it, along with the rest of the Mt. Helix Nature Theatre, to San Diego County.

As for the Mt. Soledad Latin cross, the San Diego City Council granted permission in 1952 to the Mt. Soledad Memorial Association to reconstruct a Latin cross on Mt. Soledad. The association then solicited private contributions and, without public funding, supervised and paid for the erection of the Latin cross currently atop Mt. Soledad.

8. The Mt. Helix Latin cross is maintained with funds left in trust by Cyrus Carpenter Yawkey for the purpose of maintaining the Mt. Helix Nature Theatre. San Diego County is the trustee.

The Mt. Soledad Latin cross is maintained by the Mt. Soledad Memorial Association. The source of funds and labor for the Association's maintenance of the cross is not clear.

The public parks in which both crosses are located are maintained with public (and, in the case of Mt. Helix, some private) funds; only the crosses themselves are privately maintained.

9. Proceeds from the Mt. Helix Nature Theatre's trust fund, the corpus of which is $30,000, appear to be sufficient to fund maintenance of the Mt. Helix Latin cross. These funds have also been used in order to maintain other parts of the Theater. Nevertheless, three circumstances are of note: First, until two years ago San Diego County paid for the electricity used to illuminate the cross. Given the magnitude of the trust fund, this figure may well be easily recompensable by the trust. Second, the terms of the trust require the trustee, San Diego County, to apply trust funds to the annual Easter sunrise service atop Mt. Helix; each year the trust contributes approximately $300. Third, the trust fund is administered by county employees who draw salaries from the County; neither these employees nor the County are compensated by the trust.

As for the Mt. Soledad Latin cross, in 1984 a painting supervisor with the City of San Diego's Building Maintenance Department paid a contractor $1,750.00 to repaint the cross. The supervisor had not been made aware that such maintenance was the responsibility of the Mt.

Soledad Memorial Association. The appropriate city departments have since been informed.

10. The Mt. Helix Latin cross has served as the site of numerous weddings and of an annual Easter Sunday sunrise service. In fact, the deed conveying the entire Mt. Helix Nature Theatre conditions the County's title on the annual holding of an Easter sunrise service "suitable for commemorating the resurrection of the Lord Jesus Christ, as taught by the Christian churches of the world." The terms of that deed also require that the cross be illuminated each year from Christmas Eve until New Year's Eve and on the evening before Easter day (as well as on the evenings of Thanksgiving, Mother's Day, and the grantor's and his sister's birthdays.) The County elects to illuminate the cross every night of the year.

The Mt. Soledad Latin cross was dedicated in a Christian religious ceremony on Easter Sunday, 1954. Since that time, the City of San Diego has granted the Mt. Soledad Memorial Association a permit each year to conduct a sunrise service on Easter morning. No record exists of the Association's ever having submitted an application to conduct ceremonies on Memorial Day or Veterans Day. Like the Mt. Helix Latin cross, the Mt. Soledad cross has served as the site of numerous weddings. It also has served as the site of several baptisms.

11. The Mt. Helix Latin cross was originally erected by Cyrus Carpenter Yawkey and Mary Yawkey White to the memory of their deceased mother, Mary Carpenter Yawkey. The deed by which Mr. Yawkey conveyed Mt. Helix Nature Theatre to San Diego County indicates that installed near the cross at that time was a plaque which read as follows:

MOUNT HELIX
NATURE THEATRE
FOR THE INSPIRATION AND USE
OF THE PEOPLE
LOVINGLY DEDICATED
TO THE MEMORY OF THEIR MOTHER
MARY CARPENTER YAWKEY
WHO LOVED THIS MOUNTAIN SUMMIT
AND THE INSPIRING VIEW
BY
CYRUS CARPENTER YAWKEY
AND
MARY YAWKEY WHITE
EASTER 1925

At some time between 1929, when Mr. Yawkey deeded the park to the County, and 1990, when this lawsuit was instituted, vandals destroyed

serves pilots as a navigational aid, and the cross on Mt. Soledad assists surveyors and seismologists.[12]

While the two crosses clearly are alike in many respects, they also are distinguishable. In particular, it should be noted that whereas the property on which the Mt. Soledad Latin cross stands has been public for as long as the cross has stood there, the property on which the Mt. Helix Latin cross stands did not become public until *after* the cross had been erected on it.[13]

### B. *The La Mesa Insignia*

The Latin cross at issue in the La Mesa case appears in an illustration on the city of La Mesa's official insignia. The illustration depicts several hills below two clouds. The cross is located at the center of the illustration, atop the highest hill and between the two clouds.[14] Plaintiff claims that the image formed by the cross, the hills and the clouds appears to him to be a depiction of Calvary. Defendant, the City of La Mesa, contends that the image is meant to depict Mt. Helix, which is a prominent local landmark. The insignia itself appears on police vehicles, on shoulder patches affixed to the uniforms of police, animal control and fire fighting personnel, and on official literature distributed by the city of La Mesa.

### C. *The Plaintiffs and the Injuries They Allege*

John Murphy, sole plaintiff in the Mt. Helix case, is a Catholic, San Diego County resident and taxpayer who "is offended by the use of public property and the expenditure of public money to display and illumi-

nate the cross on Mt. Helix." Complaint at 2. Although he "otherwise would visit the [Mt. Helix Nature] Theatre and take out-of-town guests there to enjoy the panoramic view it offers, [he instead] avoids visiting the Theatre because of [the presence of] the large cross." *Id.* at 2–3. *See also* Declaration of John Murphy, October 15, 1990 (Plaintiff's Exhibit 1), at 2.

Philip Paulson and Howard Kreisner, plaintiffs in the Mt. Soledad case, both are Viet Nam War combat veterans, avowed atheists and residents and taxpayers of the city of San Diego. Complaint at 2–3, 5–7. Both submit in their complaint that they are "deeply offended" by the presence of the cross on Mt. Soledad. *Id.* at 3. As soldiers they saw companions in arms who adhered to many different faiths fall in combat. *Id.* at 5–7. Having been unable to identify the occurrence of any commemorative activities at the site of the cross, they consider its characterization as a veterans memorial an "outrageous insult." *Id.* at 6–7. Both Paulson and Kreisner would like to visit Mt. Soledad in order to enjoy its spectacular view, but because the cross is there they instead avoid it. *Id.* at 5, 7. As a result of the cross' presence, they feel they "are made to feel like outcasts and second-class citizens in their own home town." *Id.* at 8.

Their co-plaintiff, the Society of Separationists, is a Maryland corporation which is licensed to do business in California and which includes them among its members. *Id.* at 3–4. It is a "nonprofit, nonpolitical, educational organization dedicated to the complete and absolute separation of state

---

the memorial plaque. The court takes judicial notice that on November 20, 1990, one week after oral argument on this motion, the County replaced the memorial plaque with a replica of the original. *See* County of San Diego's Request for Judicial Notice, filed November 27, 1990.

On April 18, 1954 shortly after it had been erected, the Mt. Soledad Latin cross was dedicated as a tribute to veterans of World War I, World War II and the Korean War. In September 1989, several months after this suit against the City was filed, and thereafter, veterans' groups have conducted Prisoner of War/Missing in Action ceremonies in Mt. Soledad Nature Park.

**12.** Mt. Helix is used as a landmark by pilots. It, but not the cross, is indicated on flight maps for navigational purposes.

The cross on Mt. Soledad has been used as a "geodetic marker" for survey and earth-quake monitoring purposes from as early as 1913 until today. It is the most important geodetic marker in San Diego County and is prominently identified in the *Horizontal Control Data* published by the U.S. Department of Commerce Coast and Geodetic Survey (indicating "Easter Cross" on chart). *See* Defendants' Exhibit I–1.

**13.** *See* above note 8.

**14.** A photocopy of the La Mesa insignia appears in the Appendix to this opinion.

and religion/church ... on behalf of its members and itself." *Id.* at 3.

James Ellis, sole plaintiff in the La Mesa insignia case, is a religious Episcopalian, La Mesa resident and taxpayer who is "deeply offended by the expenditure of taxes for insignias depicting a religious symbol." Complaint at 2–3. *See also* Declaration of James Ellis in Support of Plaintiff's Motion for Summary Judgment, October 15, 1990 (Plaintiff's Exhibit E), at 2. Because the insignia is prominently displayed on city vehicles and on official city mailings to residents, he is unable to avoid contact with it. *Id.* at 3. Mr. Ellis declares that lest the cross on the insignia offend business clients or embarrass himself, he has in the past declined to invite business clients to his home when, but for the presence of the cross on the insignia, he would have invited them. *Id.* at 2. Mr. Ellis is particularly troubled by the way in which the insignia associates Christianity with the police department. He believes that it "symbolically tells people who are Christians that they are welcome or favored ... and ... tells people who are not Christians that they are outsiders or less than welcome." *Id.* at 3.

## II.

### STANDING

Before this court can begin to consider any plaintiff's claim, it must first be satisfied that that plaintiff has standing to have his claim heard. That is, each plaintiff must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464,

472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). Plaintiffs may satisfy the injury requirement either by alleging a direct injury or by proving that they are municipal taxpayers objecting to municipal expenditures.[15]

■ The Supreme Court has made clear that *psychological* injury suffered by one who observes conduct with which he or she disagrees is insufficient to confer standing. *Valley Forge,* 454 U.S. at 485–87, 102 S.Ct. at 765–67 (intensity of plaintiff's interest in the separation of church and state cannot substitute for requirement of injury in fact). Thus even if the crosses offend plaintiffs, that offense is insufficient to entitle them to maintain suit.

■ Notwithstanding the insufficiency of psychological injury, the Supreme Court has held that the required injury need not be severe and need not be economic.[16] An example of a non-economic injury which the Supreme Court has held confers standing is the deprivation of a citizen's beneficial use of a public park. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973) (claimed impediment to plaintiffs' recreational use of natural resources is sufficient to confer standing). The rationale for this holding is succinctly explained in *Allen v. Hickel,* 424 F.2d 944 (D.C.Cir.1970), a District of Columbia case in which citizens challenged the display of a creche in a public park. In *Allen,*

> [g]overnment counsel put it at argument that if the plaintiffs didn't like to look at the creche, they could avoid walking near the Ellipse while it was occupied by the creche. [The Court of Appeals for the

---

15. Unlike federal and state taxpayers, "municipal taxpayers have traditionally been held to have standing to assert objections to municipal expenditures." *Grove v. Mead School Dist.,* 753 F.2d 1528, 1532 (9th Cir.1985), *cert. denied* 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985) (doctrine of "taxpayer standing" applicable to federal Establishment Clause challenge).

16. The Supreme Court has held that the "injury-in-fact" limitation on the jurisprudential requirement of standing should be interpreted so

as to "distinguish a person with a direct stake in the outcome of litigation—even though small—from a person with a mere interest in the problem." *See United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973) (citing cases) ("identifiable trifle" of injury is sufficient to confer standing) and accompanying text. Accordingly, a showing of slight, non-economic injury is sufficient to confer standing.

District of Columbia disagreed, however, and held that the p]laintiffs were entitled, as members of the public, to enjoy the park land and its devotion to permissible public use; *a government action cannot infringe that right or require them to give it up without access to the court to complain that the action is unconstitutional.*

*Allen,* 424 F.2d at 947 (emphasis added) (footnotes omitted) (holding that standing existed);[17] *on remand sub nom. Allen v. Morton,* 333 F.Supp. 1088 (D.D.C.1971) (holding no violation of federal Establishment Clause); *rev'd* 495 F.2d 65 (D.C.Cir. 1973).

Here, plaintiff in the Mt. Helix case and the individual plaintiffs in the Mt. Soledad case allege that the County's and the City's conduct—both in permitting the crosses to stand where they do and, allegedly, in acquiescing in the restrictive covenants associated with the Mt. Helix cross—inhibit the plaintiffs' use of a public park. Since the deprivation of a citizen's beneficial use of a public park is an injury sufficiently direct to confer standing, *see SCRAP,* 412 U.S. at 686, 93 S.Ct. at 2415, the standing requirement in the Mt. Helix and Mt. Soledad cases is met.

■ Plaintiff in the insignia case alleges that the inclusion of a cross on La Mesa's city insignia inhibits him from inviting clients to his home, thereby impeding the way he conducts his livelihood. However

small it may be, this impediment to plaintiff's livelihood generates a stake in the disposition of the La Mesa cross which to this court appears no less direct than the stakes upheld in previous establishment clause challenges. *See, e.g., American Civil Liberties Union v. St. Charles (St. Charles),* 794 F.2d 265 at 268–69 (detouring from customary route to avoid religious display is injury sufficient to confer standing), *cert. denied,* 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986); *Allen,* 424 F.2d at 947 (same).[18] Thus, the standing requirement in the La Mesa case also is met.

The standing requirement's having been met in all three cases, the court must proceed to consider the merits of each.[19]

## III.

### CONSTITUTIONAL ISSUES

Each of the three cases presently before the court raises important issues under the constitutions both of the State of California and of the United States. Because the Ninth Circuit has held that "federal constitutional issues should be avoided even when the alternative ground is one of state constitutional law," *Carreras v. City of Anaheim,* 768 F.2d 1039, 1042–43 (9th Cir. 1985) (citations omitted), this court turns its attention first to plaintiffs' state constitutional claims.

A review of all three cases reveals that the complaint in each alleges violations of

---

**17.** *See also American Civil Liberties Union v. Rabun County Chamber of Commerce, Inc.,* 698 F.2d 1098, 1105 (11th Cir.1983) (per curiam) (standing existed where plaintiffs alleged that, but for presence of large Latin cross, they would use public park); *Valley Forge,* 454 U.S. at 487 n. 22, 102 S.Ct. at 766 n. 22 (discussing *School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (standing existed because law required public school students to "assume special burdens" in order to be excused from mandatory bible reading requirement)); *American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265, 268–269 (7th Cir.1986), *cert. denied,* 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986).

**18.** In the words of the Seventh Circuit, "[i]t is the willingness of the plaintiffs to incur a tangible, albeit small cost that validates the existence of genuine distress and warrants the invocation

of federal jurisdiction." *Harris,* 927 F.2d at 1406. *See also SCRAP,* 412 U.S. at 689 n. 14, 93 S.Ct. at 2417 n. 14 ("[a]n identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation") (cited in *Harris,* 927 F.2d at 1406).

**19.** Since the court finds that at least one plaintiff in each case has standing, and since any one plaintiff's standing in each case will require the court to reach the merits of that case, the court need not address whether the Society of Separationists, co-plaintiff in the Mt. Soledad case, has standing.

In addition, since the court is satisfied that plaintiffs have alleged injuries sufficiently direct to confer standing, it need not assess plaintiffs' alternative claims of taxpayer standing. *See* above note 17.

three state constitutional provisions: first, the No Preference Clause of Article I, Section 4; second, the Establishment Clause of Article I, Section 4; and third, the Prohibition on Religious Appropriations Clause of Article XVI, Section 5. *See* Cal. Const. art. I, § 4 and art. XVI, § 5. Because the court holds today that the challenged practices in all three cases violate California's No Preference Clause, it is unnecessary to engage in further analysis under either the California or United States Constitutions.

### A. *California's No Preference Clause*

Article I, Section 4 of the California Constitution provides that:

> Free exercise and enjoyment of religion without discrimination or preference are guaranteed. The liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The legislature shall make no law respecting an establishment of religion.

Cal. Const. art. I, § 4. The first sentence of this section comprises California's so-called No Preference Clause.

The Ninth Circuit, the interpretations of which this court is duty-bound to follow, recently considered the language of the No Preference Clause and the jurisprudence arising from it. *See Hewitt v. Joyner,* 940 F.2d 1561 (9th Cir.1991). In so doing, the court relied principally on two California cases which, it stated, "define the state constitutional limits on governmental-sponsored religious displays." *Id.* at 1567. The two cases are *Fox v. City of Los Angeles,* 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663 (1978) and *Okrand v. City of Los Angeles,* 207 Cal.App.3d 566, 254 Cal.Rptr. 913 (2d Dist.1989).

In *Fox,* plaintiffs challenged whether the City of Los Angeles could constitutionally light a cross on city hall during Christmas and Easter. The California Supreme Court, ruling on appeal, acknowledged that "[i]n the California Constitution there is no requirement that each religion always be represented." *Fox,* 22 Cal.3d at 797, 150 Cal.Rptr. 867, 587 P.2d 663 (quoted in *Hewitt,* 940 F.2d at 1567). The Court further ruled, however, that "[t]o illuminate only the Latin cross ... does seem preferential when comparable recognition of religious symbols is impracticable." *Id.* (quoted in *Hewitt,* 940 F.2d at 1567). So ruling, the Court found in favor of plaintiffs and against the city. As stated subsequently by the Second District Court of Appeal, the city's conduct was unconstitutional because the city's "failure or inability to recognize the symbols or holidays of other religions showed a clear act of preference." *Okrand,* 207 Cal.App.3d at 579, 254 Cal.Rptr. 913.

Thereafter in *Okrand,* the Second District considered the constitutionality of Los Angeles' display of another religious symbol: an unlit menorah, salvaged from the Holocaust and exhibited together with a Christmas tree in the city hall rotunda. Ruling on the constitutionality of the menorah display, the court held that "in the context in which it allowed the Katowitz Menorah to be displayed, the city exhibited no preference for the Jewish religion ..." *Id.* at 579, 254 Cal.Rptr. 913.

In so holding, the court expressly identified four circumstances which materially distinguished the display in *Okrand* from that in *Fox:* First, the *Okrand* display's menorah was less religiously symbolic than the Latin cross displayed in *Fox.*[20] Second,

---

20. The *Okrand* court stated that

[t]he menorah ... differs in degree from the Latin cross in terms of its significance as a symbol of religion. The cross is the preeminent symbol of many Christian religions and represents with relative clarity and simplicity the Christian message of the crucifixion and resurrection of Jesus Christ, a doctrine at the heart of Christianity. The menorah's significance to Judaism, on the other hand, is much less direct. Chanukah is not perceived as the most important Jewish holiday. It does not

celebrate any central Jewish religious principle but rather celebrates a historical event which has provident overtones. Certainly the menorah is a central part of the traditional celebration of the holiday, but the candelabrum itself does not readily focus attention on a religious doctrine in the manner of the cross (i.e., the salvation of mankind through the atonement and resurrection of Christ), nor does it visually portray a central tenet of religion as does a nativity scene (i.e., the divine and virgin birth of Christ in mortality).

the *Okrand* menorah was considerably less conspicuous than the *Fox* cross.[21] Third, the *Okrand* display included "comparable recognition of other religious symbols."[22] *See Okrand,* 207 Cal.App.3d at 579, 254 Cal.Rptr. 913. Fourth and finally, the *Okrand* menorah's "unique historical background ... [rendered it] more a museum piece than a symbol of religious worship."[23] *See id.* at 580, 254 Cal.Rptr. 913. On the basis of these four factors,

> [t]he *Okrand* court found the display did not exhibit a preference for one religion ... [and t]herefore ... concluded that the city's display of the unlit menorah was permissible under ... the California ... Constitution[ ].

*Hewitt,* 940 F.2d at 1568.

Relying principally on the opinions in *Fox* and *Okrand,* the Ninth Circuit concluded in *Hewitt* that the No Preference clause of the California Constitution flatly prohibits a governmental body from even appearing to prefer one religion over another or others. *See Hewitt,* 940 F.2d at 1567 ("not only may a governmental body not prefer one religion over another, it also may not *appear* to be acting preferentially"). *See also id.* at 1566–1567 (quoting *Sands v. Morongo Unified School Dist.,* 53 Cal.3d 863, 281 Cal.Rptr. 34, 809 P.2d 809 (1991) (Kennard, J.) (plurality opinion) and citing *Okrand*).

Having so construed the No Preference Clause, the *Hewitt* court then addressed itself to the controversy before it, in which plaintiffs challenged whether San Bernardino County could constitutionally own and maintain a public park which contained religious statuary depicting New Testament scenes. The court ruled that "[b]ecause of their dominance of the landscape, the statues are more symbols of worship than museum pieces." *Id.* at 1568. On this and other grounds,[24] the court held the County's ownership and maintenance of the park unconstitutional.

Distilling the opinions in *Hewitt, Okrand,* and *Fox* into a set of guiding principles, this court concludes that according to California law, a government body is conducting itself unconstitutionally whenever it so much as appears to be preferring one religion over another or others. *See Hewitt,* 940 F.2d at 1567; above p. 1428. Further, although no single circumstance may act as a litmus test for assessing the appearance of preference in a government display, nevertheless certain circumstances are highly probative. Among those circumstances are:

---

*Okrand,* 207 Cal.App.3d at 579–580, 254 Cal. Rptr. 913. *Cf. Hewitt,* 940 F.2d at 1568 (discussing *Okrand*).

**21.** The *Okrand* court held that the

> display of the menorah at city hall may be distinguished from the lighted cross displayed in *Fox* by size and visibleness. The lighted cross in *Fox* was "visible for many miles in many directions, and can be and is viewed by persons driving the freeways who do not see it in the context of other Christmas decorations and who may not participate in such celebrations at all ..." [quoting *Fox.*] The Katowitz Menorah, on the other hand, stood unlit in a corner of the rotunda that was also occupied by a decorated Christmas tree.

*Okrand,* 207 Cal.App.3d at 579, 254 Cal.Rptr. 913. *Cf. Hewitt,* 940 F.2d at 1568 (discussing *Okrand*).

**22.** According to the Second District,

> there was no lack of "comparable recognition of other religious symbols." [citing *Fox*]. And, in our view, display of the menorah showed no more preference for Judaism than display of the Christmas tree showed for Christianity.

*Okrand,* 207 Cal.App.3d at 579, 254 Cal.Rptr. 913. *Cf. Hewitt,* 940 F.2d at 1568 (discussing *Okrand*).

**23.** "Finally," held the court in *Okrand,*

> the unlit Katowitz Menorah, with its unique historical background, was much more a museum piece than a symbol of religious worship.

*Okrand,* 207 Cal.App.3d at 580, 254 Cal.Rptr. 913. *Cf. Hewitt,* 940 F.2d at 1568 (discussing *Okrand*).

**24.** The court relied on two other grounds in arriving at its holding: First, the deed conveying the park to the County required that the statuary not be altered. Therefore, "[u]nlike a museum or a library which is free to add or subtract from its collection, the Antone Martin Memorial Park is a static collection of Christian symbols displayed and maintained by the government." *Hewitt,* 940 F.2d at 1568. Second, "[t]he allegedly great efforts taken by the County to ensure that a religious message was not perceived by the public [we]re unsuccessful." *Id.* at 1569.

1. the religious significance of the item(s) challenged in the display;

2. The size and visibility of the display and of the item(s) in it;

3. Whether the display includes any comparably significant item(s) of other religions; and

4. The historical background of the item(s) included in the display.

Accordingly, the court must inquire into these, and other probative circumstances, in assessing whether the government conduct at issue in each of the present three cases unconstitutionally expresses a religious preference.

## B. *The Mt. Helix Cross*

The Ninth Circuit's construction of the No Preference Clause subjects public entities to a demanding standard of constitutional compliance. So demanding is that standard that, even embracing the religiously neutral intentions alleged by the County,[25] this court still is unable to hold other than that the County's conduct with respect to the Mt. Helix cross impermissibly violates the California Constitution.

### 1. The Okrand factors

Inquiring into the four distinguishing factors discussed by the *Okrand* court and

subsequently focused upon by the Ninth Circuit in *Hewitt, see* above pages 1427–28, 1428 and *Hewitt,* 940 F.2d at 1568, the court notes that not one of these factors is satisfied by the conduct challenged in the present case.

### a. *Religious significance of the Latin cross*

Beginning with the first of the four *Okrand* factors, the court finds that the Latin cross is a powerful religious symbol. It is true, as evidenced by the varying sentiments of the plaintiffs in the instant three actions, that different individuals may identify with the Latin cross in different ways and in differing degrees. That the Latin cross is the principal symbol, and a universally recognized symbol, of Christianity, however, is beyond dispute. For regardless of how one may choose to characterize the Latin cross, the fact remains that

> [t]he cross is the preeminent symbol of many Christian religions and represents with relative clarity and simplicity the Christian message of the crucifixion and resurrection of Jesus Christ, a doctrine at the heart of Christianity.

*Okrand,* 207 Cal.App.3d at 579–580, 254 Cal.Rptr. 913.[26]

---

**25.** The presence of a secular purpose clearly would be probative in an inquiry under the United States Constitution because a secular purpose satisfies in part the federal constitutional standard regulating governments' religious involvement. *See Lemon v. Kurtzman,* 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). Further, the presence of such a purpose would be probative in an inquiry conducted pursuant to the California Constitution's Establishment Clause. Under California's No Preference Clause, however, the presence of a secular purpose is irrelevant. *See Hewitt,* 940 F.2d at 1569 ("the no preference clause is not satisfied by a secular purpose").

**26.** *See West Virginia State Bd. of Education v. Barnette,* 319 U.S. 624, 632, 63 S.Ct. 1178, 1182, 87 L.Ed. 1628 (1943) ("the church speaks through the cross"); *Harris,* at 1403 ("[t]here ... can be no doubt that a Latin cross is the principal and unmistakable symbol of Christianity as practiced in this country today"); *St. Charles,* 794 F.2d at 271 (Latin cross "is, indeed, the principal symbol of Christianity as practiced in this country today"); *Rabun,* 698 F.2d at 1103

("Latin cross is a universally recognized symbol of Christianity"); *Mendelson v. City of St. Cloud,* 719 F.Supp. 1065, 1069 (M.D.Fla.1989) ("[t]he Latin cross is unmistakably a universal symbol of Christianity"); *Hewitt v. Joyner,* 705 F.Supp. 1443, 1449 (C.D.Cal.1989) (Latin cross "epitomize[s] Christian faith ... is the pre-eminent symbol of many Christian religions and clearly represents the key Christian concept of the Crucifixion and Resurrection of Christ"), *rev'd* 940 F.2d 1561 (9th Cir.1991); *Jewish War Veterans v. United States,* 695 F.Supp. 3, 13 (D.Col.1988) ("the Latin cross ... is a readily identifiable symbol of Christianity"); *Libin v. Town of Greenwich,* 625 F.Supp. 393, 399 (D.Conn.1985) ("the cross is primarily a religious symbol ... [and a]ny secondary meaning as a symbol of peace appears to be derived from the teachings of Christ as set forth in the tenets of the Christian religions to which the cross is sacred"); *Greater Houston Chapter of the American Civil Liberties Union v. Eckels,* 589 F.Supp. 222, 234 (S.D.Tex.1984) ("[t]hat the cross ... [is] the primary symbol[ ] for Christianity ... is beyond question"), *appeal dismissed,* 755 F.2d 426 (5th

Not only is the cross a profoundly religious symbol; it also is an exceedingly powerful symbol. As the United States Supreme Court once observed,

> [s]ymbolism is a primitive but effective way of communicating ideas. The use of an emblem ... to symbolize some system, idea, [or] institution ... is a short cut from mind to mind. Causes and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their followings to [symbols] ... [T]he church speaks through the Cross, the Crucifix, the altar and shrine ... Symbols of State often convey political ideas just as religious symbols come to convey theological ones.

*West Virginia Board of Education v. Barnette*, 319 U.S. 624, 632, 63 S.Ct. 1178, 1182, 87 L.Ed. 1628 (1943) (striking down compulsory participation of public school students in flag salutes) (quoted in *Greater Houston Chapter of the American Civil Liberties Union v. Eckels (Eckels)*, 589 F.Supp. 222, 235 (S.D.Tex.1984), *appeal dismissed*, 755 F.2d 426 (5th Cir.1985), *reh'g denied en banc*, 763 F.2d 180 (5th Cir.1985), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985)).

So powerful is the image of the cross on Mt. Helix, for example, that *amicus curiae*, who resides with his wife in a home with a view of the cross, declares:

> The memorial cross on top of Mt. Helix has been a source of inspiration and comfort to us both in times of adversity, and has played, and continues to play, a personal and instrumental part in the daily practice of our faith.
>
> [W]ere the cross removed [our residence] would have a diminished appeal to other members of the Christian faith who would be potential purchasers.

Declaration of Arlington Ray Robbins in Support of Motion to Intervene, at pp. 3–4.

Further evidence of the Mt. Helix Latin cross' powerful religious symbolism may be gleaned from a catalogue of "what the site has been used for since the [cross was] constructed ... Easter sunrise services and ... wedding[s]." *Eckels*, 589 F.Supp. at 235.[27] *See* above note 11. Activities such as these not only reflect, but also augment, the religious significance of the cross on Mt. Helix. *Cf. County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter (Allegheny)*, 492 U.S. 573, 599, 109 S.Ct. 3086, 3104, 106 L.Ed.2d 472 (1989).[28]

### b. Size and visibility of the display

The powerful religious symbolism of the Mt. Helix Latin cross is further amplified by its sheer size and visibility. Standing alone at the very summit of Mt. Helix, illuminated every evening, and discernible from a considerable distance, Mt. Helix's Latin cross is *the* focal point of the public park in which it is located.[29] Further, the cross' commanding skyline presence effectively precludes the County from being

---

Cir.1985), *reh'g denied en banc*, 763 F.2d 180 (5th Cir.1985), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985).

27. The situation before this court is not unlike that presented in *Eckels*, where three Latin crosses and a Star of David erected in a public park were similarly used for religious purposes. The court in *Eckels* held that

> [t]he symbols have had the effect of converting this site into an open air church on those occasions. There is nothing remotely secular about church worship, and the religious overtones of most weddings are undeniable.

*Eckels*, 589 F.Supp. at 235. As plaintiff's counsel in the present case rather pointedly observes, "[t]he people who go to Mt. Helix for annual Easter services are there to commemorate Jesus Christ, not Mary Yawkey." Plaintiff's Opposition at 6.

28. The United States Supreme Court held in *Allegheny* that "because some ... carols performed at the site of [a] creche [display] were religious in nature, those carols were more likely to augment the religious quality of the scene than to secularize it." *Allegheny*, 492 U.S. at 599, 109 S.Ct. at 3104.

29. It is true that the religious significance of the deed's requiring the cross to be illuminated on certain Christian holidays, *see* above n. 10, is diminished by the cross' being illuminated every evening of the year. This creative resolution of one infirmity, however, merely amplifies another. For in permitting the cross to be rendered visible day *and* night the year around, the County is doubling the amount of time that its residents and visitors are exposed to the cross' powerful religious symbolism. *Cf. Allegheny*, 492 U.S. at 599, 109 S.Ct. at 3104; above n. 28.

able to successfully dissociate itself from the cross' symbolism. After all, the cross is so prominent that even were the County to install a plaque or sign expressing a message of non-preference, still the vast majority of people who see the cross—those who view it from afar—would not receive the benefit of knowing what the plaque said.[30]

c. *Comparable symbols of other religions*

Were the Nature Theatre to include symbols of other religions, comparable in significance to the Latin cross and similar in stature to its embodiment atop Mt. Helix, then any impermissible appearance of religious preference would be diminished, if not eliminated. By way of example, the City of Los Angeles successfully neutralized the potential appearance of preference in its display of the Katowitz menorah by recognizing along with the menorah a Christmas tree together with other non-Jewish religious and secular symbols. Viewed in light of the No Preference Clause line of opinions which precede this case, however, the government conduct presently at issue appears to be considerably more akin to the government conduct struck down in *Fox* and *Hewitt* than to that upheld in *Okrand*. Both *Fox* and *Hewitt* implicated displays of a symbol or symbols associated with only one religion. Similarly, San Diego's present conduct in displaying the cross atop Mt. Helix is not neutralized by recognition of the symbols or rituals of other religions.[31]

d. *Historical background*

As for the fourth and final factor identified in *Okrand*—the historical background of the item(s) included in the display—the court notes that dating as far back as it does and recognized as widely as it is, the cross atop Mt. Helix no doubt has acquired local historic significance. The historic significance of the cross on Mt. Helix is of a different quality, however, than that of displays such as the menorah salvaged from the Holocaust and upheld in *Okrand*. The *Okrand* display's significance lay in the unique set of global historical circumstances—world war, totalitarianism and genocide—from which the Katowitz menorah emerged. By contrast, the Mt. Helix cross' significance lies primarily in its prominence, its longevity and its association with the annual Easter sunrise service. Whereas in *Okrand* the item displayed sprang from the historical circumstances which rendered it significant, in the present situation it is the historical circumstances which spring from the item displayed. The historical significance of the cross on Mt. Helix, in other words, derives primarily from long use. As the Supreme Court has made emphatically clear, however, "no one acquires a vested or protected right in violation of the Constitution by long use." *Walz v. Tax Commission*, 397 U.S. 664, 678, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 (1970); *Committee for Public Education v. Nyquist*, 413 U.S. 756, 792, 93 S.Ct. 2955, 2975, 37 L.Ed.2d 948 (1973) (quoting and distinguishing *Walz*).[32]

**30.** *Cf. Allegheny*, 492 U.S. at 599, 109 S.Ct. at 3104 ("The effect of the creche on those who viewed it when the choirs were not singing—the vast majority of the time—cannot be negated by the presence of the choir program.").

**31.** Of greater constitutional concern than the County's acquiescence in the presence of the Latin cross on Mt. Helix would be its acquiescence in the covenants requiring that the cross remain lit on certain religiously significant days of the year and, even more troublingly, that the park's use be restricted to a particular sectarian activity—the Easter sunrise service—every year at a certain time. With respect to the second covenant in particular, if the government's implicit guarantee that it would

subordinate the rights of some individuals to those of other individuals based solely on those individuals' religious convictions would not generate the appearance of religious preference, then this court is at a loss to identify what could. Nevertheless, in the absence of any evidence that the County has ever enforced the Easter service covenant against an applicant desiring to use the park for an alternative purpose on Easter morning, that covenant is not ripe for review.

**32.** *See also Marsh v. Chambers*, 463 U.S. 783, 790, 103 S.Ct. 3330, 3335, 77 L.Ed.2d 1019 (1983) ("standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees"); *Allegheny*, 492 U.S. at 603,

### e. *Location*

In addition to the four factors identified as probative in the *Okrand* opinion, the court identifies a fifth: location. Insofar as its location, the Mt. Helix cross is less susceptible to the danger of exhibiting preference than were the *Fox* cross and the *Okrand* menorah. The cross in *Fox* was emblazoned across the face of as explicit a symbol of public life and governance as Los Angeles City Hall. The menorah in *Okrand,* though less conspicuous, also was located at City Hall. The public property with which the Mt. Helix cross is associated—a park, by contrast—does not symbolize government authority. Accordingly insofar as its location, the Mt. Helix cross compares favorably to the symbols considered in *Fox* and *Okrand.*

Still, however, the court notes that the public environment in which the Mt. Helix cross is displayed is not dissimilar to that in which the statuary struck down in *Hewitt* also were displayed. True, the presence of a church beside the park in *Hewitt* rendered the statuary display more preferential in appearance than has the Nature Theatre rendered the cross on Mt. Helix. Nevertheless, it is noteworthy that a display need not be as conspicuously associated with the government as were the displays in *Fox* and *Okrand* in order to run afoul of California's No Preference Clause.[33]

Considered together, the five circumstances discussed above characterize the prominent government display of a solitary symbol laden with religious meaning, the sectarian significance of which is moderated neither by the display's history nor by its remoteness from symbols of governance.

### 2. Non-factors

In addition to the five circumstances discussed above, the court notes that additional qualities characterize the cross on Mt. Helix and the County's conduct with respect to it. Among these are (a) the nature and extent of public expressions both in support of and in opposition to the cross, (b) the economics of requiring that the County remove the cross or divest itself of the property on which the cross now stands, and (c) the reversionary consequences for Mt. Helix Nature Theatre should the County in fact be required to part company with the cross.

Notwithstanding the relevance of these matters to the history and future disposition of the Mt. Helix cross, however, the court may not consider them in ruling on the constitutionality of the County's relationship with the cross.

### a. *Silence of religious minorities*

■ First, the court notes that the cross stood, unchallenged, on public property for a period of sixty-one years before this lawsuit was filed and, moreover, that the record in this case reveals few public expressions of opposition to the cross' presence. Ironically, the individual challenging the presence and disposition of the cross identifies himself as a Catholic and, therefore, as someone for whom the cross presumably is a symbol of reverence. In contrast to plaintiff's expression of concern at the public presence and disposition of the symbol of his faith are the expressions of concern which individuals of other faiths have voiced at the prospect of that symbol's *removal.* Says Rabbi Michael P. Sternfield: "I do not know of anyone in the organized Jewish community who wants to make an issue of these crosses." *See* Letter to the Editor written by Rabbi Michael

---

109 S.Ct. at 3106 ("history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed"); *Rabun,* 698 F.2d at 1111; *Harris,* 927 F.2d at 1414–1415.

**33.** *Amicus curiae* argues that an individual observing religiously symbolic grave markers in a public cemetery could not reasonably attribute to the government the expressions of religious faith implicit in those markers. The court

agrees; however, the same individual observing a 36 foot tall, religiously symbolic, permanent monument centrally placed and illuminated in a public park commanding a view of the locale could reasonably draw the opposite conclusion. So, too, could the thousands of additional reasonable observers who daily pass within view of such an edifice. For this reason, the public cemetery is distinguishable from the situation presently before the court.

P. Sternfield and published in *The San Diego Union*.[34]

His letter notwithstanding, however, Rabbi Sternfield cannot be said to speak for the entire community of non-adherents to Christianity. The record reveals the existence of other individuals—adherents and non-adherents: Catholics, Jews, Atheists and others—who feel injured by the presence of one or more of the Latin crosses involved in this, and its companion, cases.[35] That neither these individuals nor others expressed concern before now cannot be interpreted as an indication that the County's conduct with respect to the cross does not exhibit preference. In *Fox*, which presented a situation not dissimilar in this regard to the situation presently before the court,

> the City of Los Angeles contended that because the cross-lighting had occurred for 30 years without citizen complaint, obviously the public did not perceive any preference on the part of the city. The court rejected this argument, [however,] acknowledging that the silence of religious minorities may signal something quite different from disinterest.

*Hewitt*, 940 F.2d at 1567 (citations omitted) (citing *Fox*, 22 Cal.3d at 797).

### b. *Cost*

A second circumstance, with respect to which the court is aware, but which the court must not consider in ruling on the constitutionality of the County's acquiescence in the presence of the cross, is the matter of thrift. The court acknowledges that, quite apart from whatever range of personal and religious meanings have been ascribed to the Mt. Helix Latin cross over time, the cross also has evolved a separate, secular importance, for example, as a navigational aid for pilots. Therefore, it is not implausible that the assistance which the

cross provides to pilots and navigators is one reason why the County permits the cross to stand. Had the Latin cross not already been present when the County acquired Mt. Helix, then perhaps the County would have chosen to erect a different edifice in order to assist pilots.

The cross' having already been built, however, it may be argued that the County should not have to incur the superfluous expense and inconvenience of razing the cross and replacing it with a secular edifice dedicated to the very same end. Moreover, it could be argued to be a violation of the public trust were the County, as beneficiary of Cyrus Yawkey's largesse, to destroy, let deteriorate or otherwise squander a useful asset, such as the Latin cross, then present on the deeded land.

The argument is cogent; however, it can be no more persuasive in this and the accompanying two cases than have been similar such convenience-, efficiency- and expense-oriented arguments which the Supreme Court traditionally has rejected in vindication of constitutional rights. *See, e.g., Frontiero v. Richardson*, 411 U.S. 677, 690, 93 S.Ct. 1764, 1772, 36 L.Ed.2d 583 (1973) (due process); *Stanley v. Illinois*, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972) (same); *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (equal protection); *Carrington v. Rash*, 380 U.S. 89, 96, 85 S.Ct. 775, 780, 13 L.Ed.2d 675 (1965) (equal protection, right to vote). Quite simply, mere inconvenience cannot be permitted to trump constitutional strictures such as those regulating the relationship between religion and the state. The court, therefore, holds that the economic expense of removing the cross, of rendering non-public the property on which the cross stands or of otherwise attempting to cure the present

---

**34.** The court takes judicial notice of Rabbi Sternfield's letter. *See* Post–Hearing Request for Judicial Notice filed in No. 90–0134 by Amicus Curiae on December 11, 1991. Further, the court also takes judicial notice of Rabbi Sternfield's September 18, 1991 unpublished Yom Kippur address, in which Rabbi Sternfield expressed his opposition to the challenges presently before the court.

**35.** By way of example, the court notes plaintiffs in these actions, representatives of the Anti–Defamation League and other private citizens. *See, e.g.,* Plaintiffs' Exhibits F and G in No. 90–0135, documents which are matters of public record and of which the court takes judicial notice with respect to each of the three cases presently before it.

infirmity may not bear on the constitutional challenge presently before the court.

### c. *Reversionary consequences*

Finally, the reversionary consequences of the cross' removal also may not inform the court's decision.

The court entertains no doubt that the County's conduct in permitting the cross to stand atop Mt. Helix is motivated considerably, if not principally, by the desire to preserve Mt. Helix Nature Theatre as a public park. After all, the reversionary clause in the deed conveying Mt. Helix Nature Theatre appears to suggest that preservation of the cross atop Mt. Helix is necessary in order to preserve the Nature Theatre as a public park.[36] Moreover, equally necessary (according to the terms of the deed) in order for the park to remain in the public domain is adherence to the covenants requiring that an Easter service occur annually at the Theatre and that the cross be illuminated during specified Christian holidays.[37] If the County fails to perform a single one of these covenants, then it risks the park property's reversion to the heirs of Cyrus Yawkey. Thus it is fair to infer that the preservation of a public park is a principal factor motivating the County to permit the cross to stand, to restrict the Theatre's use annually on Easter Sunday and to permit the cross to be illuminated on certain nights of the year.

Whatever the reason may be for San Diego County's compliance with the restrictive covenants, however, it is axiomatic that restrictive covenants and potential possibilities of reverter may not compromise guarantees so fundamental as to be reposed in the Constitution either of the United States or of any constituent state. By way of example, if the Yawkey deed included a covenant requiring that the Mt. Helix Nature Theatre revert to a private interest if a white person used the property, then the County's conduct in excluding whites from the park would satisfy its contractual covenant yet violate the guarantees of equal protection found in both the California and United States constitutions. *See* Cal. Const. art. I, § 7 (equal protection); U.S. Const. amend. XIV, § 1 (same). Accordingly, the County's conduct would be unconstitutional as a matter of law, and the County would be required to stop excluding whites, regardless of the attendant reversionary consequences. In that case, as in this, to permit the reversionary consequences of covenant noncompliance to influence the court's ruling on a constitutional issue would be to render subordinate to private contract the fundamental, *constitutional* directives which this court is sworn to uphold.

Just as the court may not suspend the directives of the Equal Protection Clause in vindication of public space, so may it not suspend the directives of the No Preference Clause in pursuit of the same end. Before the court is a constitutional challenge, not an action for declaratory judgment or contractual breach. Accordingly, only the constitutional issue is ripe for adjudication, and the reversionary consequences of today's decision must be left to be adjudicated another day. *See Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (whether designating public park for exclusive use by white people satisfies the Fourteenth Amendment is an issue to be considered separately from the reversionary consequences of extending park use to non-whites).

The court now turns to Civ. No. 89–0820 GT, challenging the inclusion of a Latin cross on the insignia of the City of La Mesa.

### C. *The La Mesa Insignia*

■ The City of La Mesa contends that including the Latin cross on its official insignia is intended to help the public iden-

---

**36.** The reversionary consequences of the deed conveying Mt. Helix Nature Theatre to San Diego County are not properly before the court. The present lawsuit poses constitutional issues only. It does not provide a sufficient legal or evidentiary basis from which to rule on the sufficiency and application of the deed's reversionary clause.

**37.** Among the evenings of the year on which the deed expressly requires that the cross on Mt. Helix be lit are Christmas Eve and the night before Easter. *See* above n. 10.

tify the insignia's bearers with the city of La Mesa. Mt. Helix is a prominent local landmark commonly associated with La Mesa, and the Latin cross atop Mt. Helix is its unique distinguishing feature. As the city's counsel stated in oral argument,

> The logo clearly depicts Mount Helix, and I think that depiction is certainly logical. The city of La Mesa has been known for many, many years as "the Jewel of the Hills." Well, the Hill is Mount Helix. There is a high school named for Mt. Helix; La Mesa residents get their water from the Helix Water District; there are a wide variety of establishments in the city of La Mesa that bear the name Mount Helix and Helix ... So there is a very firm, long standing tie between the city of La Mesa and Mount Helix.

Given the geographic and historic nexus between Mt. Helix, the Latin cross atop it and the city of La Mesa, it is clear that the cross' inclusion on the city's official insignia would help a knowledgeable public to quickly, easily and correctly identify local police officers, squad cars, fire fighters, animal control officers and other city employees and vehicles. Accordingly, the court accepts as reasonable counsel's representation that inclusion of the cross on the city's insignia is intended to represent a well-known local feature identifiable with La Mesa and, in so doing, to render the City's property and personnel more readily identifiable.

Were this particular feature not so closely and universally identifiable with a particular religion, then its presence on a government insignia might not disturb the No Preference Clause. Here, however, the feature depicted on what La Mesa has chosen as the symbol of its very authority to govern is the profoundly religiously symbolic Latin cross. Moreover, it is the Mt. Helix Latin cross, which this court already has found contributes to an appearance of government religious preference sufficient to render unconstitutional its presence in a public park. *See* above pp. 1429–34. Under such circumstances, the court cannot find other than that La Mesa's incorporation of the Mt. Helix Latin cross in its official insignia communicates a message of government preference for religion in general, and for certain sects in particular, thereby violating California's proscription against the appearance of preference.

The danger implicit in permitting the incorporation of a religious symbol within a symbol of the authority to govern has been noted by the Tenth Circuit in *Friedman v. Board of County Commissioners of Bernalillo,* a case involving the incorporation of the Latin cross on a city seal. In *Friedman,* the court expressed concern lest

> [a] person approached by officers leaving a patrol car emblazoned with this seal could reasonably assume that the officers were Christian police, and that the organization they represented identified itself with the Christian God. A follower of any non-Christian religion might well question the officers' ability to provide even handed treatment. A citizen with no strong religious conviction might conclude that secular benefit could be obtained by becoming a Christian.

*Friedman,* 781 F.2d 777 (10th Cir.1985) (en banc), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986) (holding district court's order upholding county seal "clearly erroneous").[38] As the *Friedman* court

---

**38.** *See also Harris,* 927 F.2d at 1412. *Harris* involved a challenge to a seal within which the Latin cross was no more prominent than several secular images. The court in *Harris* held that [l]ike the seat of county government in ... *Allegheny* ... the corporate seal of a municipality is plainly under government control and is a clear symbol of government power. In fact the Rolling Meadows seal presents a more compelling case for finding the challenged display unconstitutional. The City's seal is a permanent statement that is viewed year-round, while the creche is displayed only seasonally amidst the secular celebration of Christmas. The Latin cross on the seal, then, brings together church and state in a manner that suggests their alliance perhaps even more ardently than the unconstitutional creche display[ ] in ... *Allegheny* ... The seal of Rolling Meadows acts as the City's imprimatur for official correspondence, property and business. The conspicuous depiction of the preeminent symbol of a particular faith on that seal conveys a message of approval that is simply inconsistent with the first amendment.

further concluded, the government's inclusion of a Latin cross in its imprimatur would have "threatening connotations" for, among others, Lebanese Moslems, Northern Irish Protestants, Native Americans and Jews. 781 F.2d at 781–82.[39] *Cf. Mendelson v. City of St. Cloud,* 719 F.Supp. 1065 (M.D.Fla.1989).[40]

Clearly, the Latin cross is not a benign symbol, and the perception that it is favored could well deter non-adherents from living in, visiting, or serving as employees of the City of La Mesa. The court, therefore, holds that La Mesa's inclusion of the Latin cross on its insignia is susceptible of the appearance of government preference and, therefore, is in violation of the No Preference Clause.

The court now turns its attention to Civ. No. 90–0135 GT and the cross atop Mt. Soledad.

### D. *The Mt. Soledad Cross*

■ The Latin cross displayed atop Mt. Soledad is subject to the same constitutional infirmities to which the Latin cross displayed atop Mt. Helix is subject. Like its Mt. Helix counterpart, the Mt. Soledad cross is a powerful sectarian symbol, the religious effect of which is evidenced by the uses to which it has been put as the backdrop for Christian sectarian events, such as weddings, baptisms and Easter sunrise services. Its commanding presence and nightly illumination at the very summit of Mt. Soledad render it the focal point of the public park in which it stands—so much so that it may be said, as between the Latin cross and the park, it is not clear which is meant to adorn which. No comparable symbols of other religions are present to moderate the cross' sectarian message. Nor is the cross' sectarian significance mitigated by its history. In fact, to the contrary, history belies and reinforces the sectarian significance of the Latin cross displayed atop Mt. Soledad.

The City contends that it permits the cross to stand in order to commemorate the lives and sacrifices of fallen soldiers. "It is obvious," asserts counsel for the City, "that a cross used as a war memorial has lost its religious symbolization and has become resymbolized to take on a new commemorative secular meaning." Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, November 13, 1990, at 11. Obvious though this may seem to counsel for the City, however, it is equally obvious to this court that "even if one strains to view the [cross] in the context of a war memorial, [its] primary effect is to give the impression that only Christians ... are being honored." *Eckels,* 589 F.Supp. at 235. *See also* Declaration of Rabbi Michael Sternfield;[41] *Libin,* above n. 26.

---

*Id.* (citation omitted) (holding that inclusion of cross on government seal violated federal Establishment Clause).

**39.** The cross incorporated in the seal before the *Friedman* court presented an appearance of preference more egregious than that presented by the cross incorporated in La Mesa's insignia: The *Friedman* cross was more conspicuous and was accompanied by the Latin phrase, "Con Esta Vencemos" ("With This We Conquer"). *See Friedman,* 781 F.2d at 782. The egregiousness of one incursion on the Constitution, however, cannot excuse the smaller magnitude of a second, even inadvertent incursion. *Compare Friedman* and *Harris,* 927 F.2d at 1415 (reversing lower court's finding that inclusion of non-religious symbols in city seal sufficiently neutralized any religious message that could be conveyed by inclusion of cross).

**40.** *Mendelson* involved an illuminated Latin cross erected atop a water tower in the city of St. Cloud. Emblazoned across the middle of the tower was the slogan "Welcome to St. Cloud" and a replica of the city seal. The court concluded from this display that "[t]hose who observe the cross atop the water tower can only presume that the City of St. Cloud has abandoned any pretense of religious neutrality and has wholeheartedly endorsed the Christian religion." *Id.* at 1071 (citing cases).

**41.** Rabbi Sternfield declares:

The religiosity of the cross is, if anything, heightened when it is used in connection with memorializing the dead, because of the close connection between our thoughts of death and our religious beliefs. A war memorial intended to honor all veterans, or all war dead, would send a message of exclusion of Jews if it were in the shape of a cross. While this might not be the intended message, the use of a cross for this purpose would nonetheless convey this message from the perspective of most Jews ... The cross has not become a secular symbol, from the perspec-

More troubling than the City's characterization of the Mt. Soledad cross as a *secular* memorial, however, is its characterization of the Mt. Soledad cross as a memorial at all. Whereas Cyrus Yawkey's deed corroborates the genuineness of the commemorative objective attending the cross on Mt. Helix, no corresponding evidence corroborates the genuineness of the alleged commemorative objective which the City advances in support of the cross on Mt. Soledad. In fact to the contrary, the evidence indicates that the city's purported commemorative objective is a pretext.

The numerous declarations, news articles, book excerpts and other exhibits submitted by the parties reveal only one occasion between the erection of the cross on Mt. Soledad and the filing of this lawsuit on which the cross site has ever been recognized as a war memorial.[42] That occasion was the cross' dedication on April 17, 1954, when the *San Diego Union* reported that the cross "is meant to be a lasting memorial to the dead of the two world wars and the Korean fighting." With the exception of this single newspaper report, there is no evidence that prior to this lawsuit the City intended the cross to serve as a memorial.

Correspondence between the City and the Mt. Soledad Memorial Association, which the city authorized to build and maintain the cross, together with newspaper accounts from 1954 indicate that the cross was intended to replace predecessor crosses which had once been the scene of Easter sunrise services but had since been vandalized or fallen into disrepair. Clearly these predecessor crosses, which date as far back as 1913, could not have been erected as memorials to the dead of the two world wars and the Korean fighting, all of which occurred after 1913. Nevertheless, the fact that non-commemorative crosses once stood on a site where citizens subsequently chose to erect a new cross should not by itself defeat the genuineness of the new cross' purported commemorative purpose.

News accounts reveal further indications of a religious purpose. Several such accounts indicate, for example, that a ceremony dedicating the cross occurred, as planned, on Easter Sunday 1954. Although Memorial Day occurs just 6 weeks after Easter, the Memorial Association evidently preferred to schedule the cross' completion and dedication for the day of the Resurrection. Although it could have selected any of innumerable different symbols, including many different types of crosses, in order to commemorate fallen soldiers of all faiths, the Memorial Association selected the configuration of the *Latin* cross, the type of cross on which biblical and historical accounts indicate that Jesus Christ, on the morning marked by Easter, rose from the dead.

City records, correspondence and news articles indicate, moreover, that every Easter without fail since 1954, the Mt. Soledad Memorial Association has sponsored an Easter sunrise service at the site of the cross. There is no record of the Association, the City or any other organization having sponsored a memorial service or ceremony at the site of the cross on Memorial Day, Veterans Day or any other day between Easter Sunday 1954 and the day on which this suit was filed. Also during the period between Easter Sunday 1954 and the day on which this suit was filed, no plaque or sign existed to indicate to visitors that the cross was intended to commemorate our country's war dead. As plaintiffs observe, there was "no way for a visitor to know that on April 18, 1954, someone stood beside the Cross and described it as a veterans memorial."

In light of this evidence, it is not surprising that numerous travel guides, road maps, the Yellow Pages telephone directory and even federal government publica-

---

tive of Jews, for any purpose, and because of the heightened religiosity of symbols when used in the context of death, it would not be reasonable to conclude that persons of non-Christian faith would perceive this use of the cross as secular.

Declaration of Rabbi Michael Sternfield, October 26, 1990, at 1 (Plaintiffs' Exhibit J).

**42.** *Since* this lawsuit was filed, several veterans ceremonies have been held atop Mt. Soledad. *See* above note 13.

tions refer to the structure atop Mt. Soledad as the "Soledad Easter Cross." Even the Mt. Soledad Memorial Association itself appears to have lost sight of the purported purpose for which it erected the cross. Its own bylaws describe its purpose as the promotion of "community interest in the development of the public facilities of the Mt. Soledad Park area." The bylaws make no reference to the commemoration of war dead.

Faced with this battery of evidence, it is difficult to conclude that the commemorative objective advanced by the City is anything other than pretext. The court, therefore, finds that insofar as the disposition of the Mt. Soledad Latin cross, the City has impermissibly exhibited (if not exercised) preference. The City's conduct, consequently, is unconstitutional, and the City is directed that, if it truly wishes to honor the war dead, then it should do so other than with the Latin cross which it has permitted to stand atop Mt. Soledad. *Cf. Eckels,* 589 F.Supp. at 234 ("because the county can effectively recognize its war dead without resort to the use of these religious symbols, it must do so").

## IV.

## CONCLUSION

The No Preference Clause, which California courts and the Ninth Circuit have interpreted as censuring so much as even the appearance of religious partiality, is a sweeping constitutional edict. Insofar as the No Preference Clause is also the supreme law of California, binding constitutional precedent compels this court to hold that the permanent presence and disposition of the Latin crosses atop Mt. Helix, atop Mt. Soledad and on the La Mesa insignia are unconstitutional.

Were the parcels of land atop which the Mt. Helix and Mt. Soledad crosses presently stand privately rather than publicly owned, then these cases would be entirely different. Likewise were the crosses raised only periodically in order to accommodate individuals who from time to time wish to incorporate these public spaces in their religious observance, then again the court would be dealing with an entirely different situation. Where as here, however, the Latin cross appears as a permanent, salient symbol on public property and on a public imprimatur, California's Constitution will not permit it to continue to stand.

As to each of these three cases, the court enters summary judgment for plaintiffs and issues a permanent injunction forbidding the permanent presence of each cross on the public property or imprimatur where it currently appears. The court grants defendants three months within which to comply with its order and further directs that any stay of the order should be sought from the Court of Appeals.

IT IS SO ORDERED.